JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

WENSHENG LIN and
SHENG LI CHEN,

Defendants.

17 CV 3054

17 Civ. (    )

ECF CASE

**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* EMERGENCY
APPLICATION FOR AN ORDER TO SHOW CAUSE,
FOR AN ASSET FREEZE, AND OTHER RELIEF**

Kevin P. McGrath
Jennifer K. Vakiener
Hane L. Kim
Steven G. Rawlings
Attorneys for Plaintiff
Securities and Exchange Commission
New York Regional Office
200 Vesey Street
New York, N.Y. 10281
(212) 336-0533 (McGrath)

April 26, 2017

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

    A.  Defendants .............................................................................................. 2

    B.  The Issuer ............................................................................................... 3

    C.  EPCC S-1 Offering and Sale to South African Investors ........................... 3

    D.  EPCC is Offered as a Shell Company for Sale .......................................... 6

    E.  EPCC Engages in a Forward Stock Split ................................................. 6

    F.  Sales of All 38 South African Investors' Shares to Defendants and  Eight Other Chinese Investors ......................................................................................... 6

    G.  Creation of IMMG and Reverse Merger into EPCC .................................. 8

    H.  Chinese Investors Deposit IMMG Shares in U.S. Brokerage Accounts..................... 10

    I.  Trading In IMMG and Promotional Campaign ......................................... 12

    J.  Lin's Trading ........................................................................................ 14

    K.  Chen's Trading...................................................................................... 15

ARGUMENT ...................................................................................................... 17

  I.  DEFENDANTS' ASSETS SHOULD BE FROZEN TO ENSURE SUFFICIENT ASSETS WILL BE AVAILABLE AND WITHIN THE COURT'S JURISDICTION TO SATISFY A JUDGMENT. ......................................... 17

    A.  The Burden for the SEC to Obtain an Asset Freeze is Not Onerous. ........................ 17

    B.  The Commission Has Established a *Prima Facie* Violation of Section 5 ................. 18

    C.  EPCC's S-1 Filing Does Not Apply to the Defendants' Sales ............................... 20

    D.  The Defendants Will Not Be Able to Establish an Exemption From Registration ............................................................................................. 20

      1.  The Transaction Registered on EPCC's Form S-1 Never Occurred.................... 21

      2.  Defendants Do Not Qualify for Rule 144 Safe Harbor........................................ 23

      3.  The Defendants Were Underwriters Under Section 4(a)(1) ................................ 25

    E.  An Asset Freeze Order Should Enter Because of the Serious Risk that the Substantial Proceeds of the Trading Will Be Transferred Offshore. .......................... 28

  II.  EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE IS NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING REQUESTED BY THE COMMISSION. ....................................................... 29

CONCLUSION.................................................................................................... 31

i

## Table of Authorities

**CASES**

*Ackerberg v. Johnson*, 892 F.2d 1328 (8th Cir. 1989) ...................................... 26

*F.T.C. v. Pecon Software Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272
 (S.D.N.Y. Aug. 7, 2013) ..................................................................... 30

*In re GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262
 (S.D.N.Y. 2012) ................................................................................. 30

*In re Gordon Brent Pierce*, Exchange Act Rel. No. 71664,
 2014 WL 896575 (Mar. 7, 2014). ....................................................... 19

*In the Matter of Oklahoma-Texas Trust*, 2 S.E.C. 764 (1937),
 *aff'd*, 100 F.2d 888 (10th Cir. 1939) ................................................... 25

*Lewisohn Copper Corp.*, 38 S.E.C. 226 (1958) ......................................... 20

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
 265 F.R.D. 106 (S.D.N.Y. 2010) ......................................................... 30

*R. A. Holman & Co. v. SEC*, 366 F.2d 446 (2d Cir. 1966) ......................... 20

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ......... 30

*SEC v. Am. Board of Trade, Inc.*, 645 F. Supp. 1047 (S.D.N.Y. 1986) ......... 29

*SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. April 21, 2014) ......... 29

*SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ......... 19

*SEC v. Byers*, No. 08 Civ. 7104, 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009) ......... 17

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998),
 *aff'd*, 155 F.3d 129 (2d Cir. 1998) ..................................................... 18

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ........................... 17, 18, 19

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ........................... 18, 19, 25

*SEC v. ConnectAJet.com, Inc.*, No. 09 Civ. 1743,
 2011 WL 5509896 (N.D. Tex. Nov. 9, 2011) ...................................... 26

*SEC v. Czarnik*, No. 10 Civ. 745, 2010 WL 4860678
 (S.D.N.Y. Nov. 29, 2010) ................................................................... 19

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d. 402 (S.D.N.Y. 2001) ......... 28

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ................................................ 25

*SEC v. Maillard*, No. 13 Civ. 5299, 2014 WL 1660024 (S.D.N.Y. April 23, 2014) ......... 17

*SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ......... 19

*SEC v. Offill*, No. 07-cv-1643, 2012 WL 246061 (N.D. Tex. Jan. 26, 2012) ......... 28

*SEC v. Olins*, No. 07 Civ. 6423, 2010 WL 900518 (N.D. Cal. Mar. 12, 2010) ......... 26, 28

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ....................................... 18

*SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) ........... 29

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ................................................................... 17

*SEC v. Universal Express, Inc.*, 415 F. Supp. 2d 412 (S.D.N.Y. 2007) ...................................... 18

*SEC v. Universal Major. Indus.*, 546 F.2d 1044 (2d Cir. 1976) ................................................. 18

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ......................................................... 19

*SEC v. Well Advantage Ltd.*, No. 12 Civ. 5786, Docket Nos. 15, 35
  (S.D.N.Y. Aug. 6 & 22, 2012) .................................................................................................. 29

*Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ....................................................................... 17

*United States v. Lebanese Canadian Bank*, 285 F.R.D. 262 (S.D.N.Y. 2012) ............................ 30

## STATUTES

<u>Securities Exchange Act of 1934</u>

Section 12, 15 U.S.C. § 78l .......................................................................................................... 24

Section 13, 15 U.S.C § 78m ................................................................................................... 23, 24

Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C § 78o(d) ................. 5, 23, 24

<u>Securties Act of 1933</u>

Section 2(a)(11), 15 U.S.C. § 77b(a)(11) ............................................................... 20, 21, 25, 28

Section 20(d)(2), 15 U.S.C. § 77t(d)(2) ...................................................................................... 17

Section 4(a)(1), 15 U.S.C. § 77d(a)(1) ................................................................................. 20, 25

Section 5, 15 U.S.C. § 77e .................................................................................................. passim

## RULES

Fedederal Rules of Civil Procedure, Rule 4(f) ...................................................................... 30, 31

Form S-1, General instructions, 17 CFR 239.11 .......................................................................... 3

Rule 144 of the Securities Act of 1933, 17 CFR 230.144 ................................... 21, 23, 24, 25

Rule 405 of the Securities Act of 1933, 17 CFR 230.405 ....................................................... 23

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its *ex parte* emergency application for an order to show cause, for an asset freeze, expedited discovery, and other relief against Defendants Wensheng Lin ("Lin") and Sheng Li Chen ("Chen") (collectively, "Defendants").

## PRELIMINARY STATEMENT

This emergency action seeks to freeze assets located in the United States of Defendants Lin and Chen.  The Complaint filed in this action charges the Defendants, based in China, with engaging in the sale of unregistered shares of penny stock into the public market of Immage Biotherapeutics Corp. ("IMMG") in violation of Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").  IMMG is a biotechnology company reportedly engaged in cancer research.  Lin and Chen acquired their shares for approximately $0.0037 per share and sold roughly a third of their shares for as much as $1.4745 and $1.1286 per share, for net profits of approximately $1,220,000 and $582,000, respectively.  The majority of Defendants' profits were the result of recent sales of IMMG securities just a few days after promotional websites began touting IMMG's stock through claims that, at a minimum, were materially misleading, and before trading in IMMG was suspended by the Commission on April 4, 2017.

The Defendants reside abroad and have the ability to move assets quickly outside of the United States.  Lin already transferred $65,000 on February 9, 2017 and $458,000 on April 3, 2017, a few days after the promotion began, to an account at a bank in Hong Kong.  Both consist of illegal proceeds from his sales of IMMG stock.  On March 6, 2017, Chen transferred approximately $97,000—illegal proceeds from her sales of IMMG stock—to an account at the same bank in Hong Kong.  Since then, both Lin and Chen have attempted to wire to Hong Kong hundreds of thousands of dollars more.  Absent an immediate *ex parte* asset freeze, Defendants

are likely to likely to transfer their remaining proceeds and assets beyond the reach of the Commission or a U.S. court.

The Complaint alleges a *prima* facie case that Defendants violated Section 5(a) and 5(c) of the Security Act by engaging in offers and sales of unregistered securities through interstate means.  Once the Commission has established a *prima facie* case of a Section 5 violation, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration was available for the offer or sale of the security.  As discussed below, Defendants will not be able to meet their burden of proving that an exemption or safe harbor from registration is available to them.

Accordingly, we request an emergency *ex parte* order freezing assets of the Defendants, a permanent injunction for their violations of the registration provisions of the Securities Act, and disgorgement plus prejudgment interest, civil penalties.

## STATEMENT OF FACTS

### A.   Defendants

**Defendant Lin**, age 23, resides in the Guandong province of China.  According to new account documentation for Lin's brokerage account, he is an Assistant Engineer at Shantou Jinping Sunny Machinery Factory, which deals with machinery, industrial parts, and tools. (Declaration of Joseph Darragh dated April 26, 2017 ("Darragh Decl.") at ¶ 6 and Ex. 95 thereto.)[1]

**Defendant Chen**, age 32, resides in the Guandong province of China.  According to new account documentation for Chen's brokerage account, she is a Deputy Sale Manager at Donguan Keguan Mechanical and Electrical Co. Ltd.  (Darragh Decl. at ¶ 7 and Ex. 96.)

---

[1] All references to "Ex." are to Exhibits to the Darragh  Decl.

**B.**   **The Issuer**

**IMMG** began as Epicure Charcoal, Inc. ("EPCC"), which was incorporated in Nevada on June 21, 2012.  (Ex. 1)  EPCC claimed it was a "development-stage company that intends to sell [its] own brand of Charcoal products for BBQ and restaurant grilling purposes."  EPCC's filings identify Founder A as the company's founder and sole officer and director.  (Ex. 2 at 5.)  Founder A purchased 5,000,000 restricted shares at $0.001 per share on September 30, 2012, for a total of $5,000.  (*Id.* at 33.)  Founder A did not have any experience in the charcoal industry.  (Ex. 3 at 21; Ex. 4 at F_000043; Darragh Decl. at ¶ 19).)  IMMG later merged into EPCC as discussed below.

**C.**   **EPCC S-1 Offering and Sale to South African Investors**

On December 10, 2012, EPCC filed a Form S-1 registration statement with the Commission, seeking to register the sale of 4,500,000 shares of common stock at $0.04 per share.  (Ex. 2 at 2.)  Form S-1 is an initial registration form for the public offer and sale of securities by companies and is used when no other form is authorized or prescribed.  (Form S-1, General instructions (17 CFR 239.11).)  The EPCC Form S-1 registration went into effect on July 31, 2013, after three amendments.  (Ex. 5.)  EPCC stated in the Form S-1 that it was a shell company:  it "has not yet implemented its business model and to date has generated no revenues."  (Ex. 2 at 5.)  (Darragh Decl. at ¶ 9.)

On August 8, 2013, EPCC appointed a South African national as Secretary of the Corporation ("SA Secretary").  (Ex. 3 at 20.)  According to EPCC's public filings, as of January 2013, the SA Secretary was studying marketing at the University of the Free State.  (*Id.* at 21.)  On April 19, 2017, Commission staff contacted the SA Secretary by phone.  When asked if he was familiar with EPCC, he answered yes and that he was the secretary of the company.  He then

said, "Hello....hello...," and the call was disconnected.  He has not answered the staff's subsequent calls.  (Darragh Decl. at ¶ 10.)

In and around August and September 2013, 38 individuals, all based in South Africa and reported to be friends or family of the SA Secretary or co-workers of his mother, purportedly entered into Subscription Agreements to purchase a total of 147,042 shares of EPCC from the company for a total of $5,911.03.  The SA Secretary supposedly had solicited these individuals.  The number of shares that each shareholder purportedly purchased ranged from 2,947 shares for $147.37 to 7,895 for $315.79, approximately $0.04 per share.  (Ex. 6; Ex. 8.)  (Darragh Decl. at ¶¶ 11, 19.)

The majority of the South African investors purportedly paid for their shares using payment methods that could not be traced to their names.  Payments from 20 investors were evidenced by only a deposit slip or a deposit receipt, listing the SA Secretary's name, reflecting that the deposits were made in cash.  (Ex. 7b; Ex. 7c.)  All deposits were made on August 27, 28, or 30, 2013.  (*Id.*)  Payments from 14 other investors were evidenced by nearly sequential bank cashier checks (skipping only one in a sequence), all dated August 24, 2013, indicating they were all purchased at the same time (Ex. 7a.)  (Darragh Decl. at ¶ 12.)

On April 19, 2017, Commission staff spoke with two of the supposed South African investors ("SA Investor 1" and "SA Investor 2"), one of whom was purported to have sold her shares to Lin.  SA Investor 1 stated that the SA Secretary, a high school friend, had approached him at work and had asked him to sign paperwork for an investment in EPCC.  The SA Secretary never told SA Investor 1 that he would have to pay for the supposed investment; SA Investor 1 never personally paid anything.  SA Investor 1 signed a document at the SA Secretary's request (that SA Investor 1 claims not to have read), and never heard about it again.  The address listed

on the stock agreement was not that of SA Investor 1, and SA Investor 1 never received any shares, sold any shares, or received proceeds from the sale of any shares of EPCC. SA Investor 2, who also purportedly sold her shares to Lin, stated she was not aware that she had ever invested in a company called EPCC or any charcoal company. She said she knew the SA Secretary, but that he never asked her to invest in a company or sign papers. (Darragh Decl. at ¶ 13.)

On September 30, 2013, the end of the first fiscal year after filing its S-1, EPCC ceased to be a reporting company pursuant to Section 15(d) of the Exchange Act (which it had been before as a result of its S-1 filing) because 15(d) reporting requirements would only continue if it had had 300 or more record holders. At no time since then has the number of record holders increased to 300 or more. (Darragh Decl. at ¶ 16.)

On October 3, 2013, Founder A directed Transfer Agent A to send "all Share certificates to" the SA Secretary in South Africa. (Ex. 10.) The shares purportedly issued under the Form S-1 were issued in the names of the 38 investors on October 4, 2013 (Ex. 12), and Transfer Agent A mailed the certificates on October 7, 2013, along with the certificate of apparent Canadian-resident Founder A, to the SA Secretary. (Ex. 13.) On October 11, 2013, Founder A informed Transfer Agent A, "Thank you we have received all 39 share certificates." (Ex. 14.) (Darragh Decl. at ¶¶ 14-15.)

On February 4, 2014, EPCC's board (by Founder A as sole director) elected to redeem and retire 4,780,000 of Founder A's shares, leaving him with 220,000 restricted shares. (Ex. 15.) (Darragh Decl. at ¶ 20.)

### D.      EPCC is Offered as a Shell Company for Sale

In September 2014, an individual who had no known ties to EPCC began to offer EPCC

for sale, emailing another person: "Here are 2 shells you are looking for.  EPCC delivers 100%

but not DTC . . . ."  (Ex. 16.)  This suggests that the email sender was marketing EPCC as a shell

company for which 100% of its shares could be delivered to a potential buyer, and the reference

to DTC indicates that the shares had not yet been confirmed by the Depository Trust Company as

eligible for deposit.  A company with shares eligible for deposit with DTC makes it more

marketable to purchase as a shell.  (Darragh Decl. at ¶ 21.)

### E.      EPCC Engages in a Forward Stock Split

On or before February 12, 2015, EPCC amended its articles of incorporation to "effect a

273:1 Forward Stock Split," and according to the corporate action EPCC's share amount went

from approximately 367,039 to 100,201,647 shares.  (Ex. 17; Ex. 18.)  (Darragh Decl. at ¶ 22.)

### F.      Sales of All 38 South African Investors' Shares to Defendants and Eight Other Chinese Investors

At least as early as February 2015, Attorney A began to work on the sale of Founder A 's

restricted EPCC shares to an entity referred to herein as Hong Kong Corp., and for the purported

sale of the 38 South African's EPCC shares to the Defendants and eight other Chinese investors.

(Exs. 22, 23, & 35)).)  (Darragh Decl. at ¶ 24.)

All but one of the 38 South African investors purportedly signed "Irrevocable Stock

Power" agreements, agreeing to "irrevocably constitute and appoint" Transfer Agent A to

transfer the shares, and "Third Party Release" forms to transfer their shares.  (Ex. 24.)  These two

documents can be used to transfer ownership of shares, in lieu of signing the back of stock

certificates.  These documents were left blank where the buyer of the shares was to be listed.

(*Id.*)  These 37 investors purportedly signed these documents in front of the same notary in the

town of Bloemfontein, South Africa.  (*Id.*)  At least 16 of these purported shareholders' addresses were in Northern Cape, South Africa (Ex. 8), which is more than 250 miles from Bloemfontein, South Africa.  (Darragh Decl. at ¶¶ 25-27.)  SA Investor 1 only recalled signing one document and said he did not sign any document before a notary.  (Darragh Decl. at ¶ 28.)  The shares of the remaining South African investor were eventually also transferred to one of the Chinese investors.  (Darragh Decl. at ¶¶ 29, 30.)

From March 19 to March 26, 2015, Attorney A's attorney-trust account received incoming wires from the ten Chinese investors, ranging from $13,906.42 to $16,912.74, all wired from banks in China.  (Ex. 62; Ex. 29.)  Those investors were sold a total of 40,142,136 shares at approximately $0.0037 per share.  (*Id.*; Ex. 24; Ex. 28.)  (Darragh Decl. at ¶ 31.)

The Commission staff has been unable to uncover any evidence that the purported South African investors received the proceeds from their purported sales.  First, SA Investor 1 told the staff that he had never received the proceeds (and, indeed, never paid any proceeds for, or owned, any shares).  SA Investor 2 also claims to have never owned any shares of EPCC stock.  Second, the records for Attorney A's trust account do not show any payments from this account to the South African investors and do not show debits matching the amounts that the Chinese investors purportedly paid for the share purchases.  (Ex. 29.)  (Darragh Decl. at ¶ 32.)

Lin and Chen purchased their shares under separate stock purchase agreements dated March 31, 2015, and on April 1, 2015, Founder A agreed to sell his restricted shares of EPCC to Hong Kong Corp. for $180,000.  (Ex. 30; Ex. 31; Ex. 34.)  Attorney A's law firm acted as escrow agent for all three sales.  (Darragh Decl. at ¶ 33, 36.)  Lin purchased 4,526,067 shares—including purportedly from SA Investor 2 who, as noted above, did not recall investing in EPCC—for $16,912.74, for a price per share of $0.003737.  (Ex. 30 at 0012591-99.)  Lin signed

his stock purchase agreement on March 20, 2015, and the sellers purportedly signed from March 3 to March 19, 2015. (*Id.*) Chen purchased 3,897,621 shares for $14,564.40, for a price per share of $0.003737. (Ex. 31 at 0000476-83.) No registration statements were filed or in effect with respect to the purported sale of the securities from the purported South African investors to the Chinese investors. (Darragh Decl. at ¶ 34.)

Lin and Chen were issued Chinese passports on March 17, 2015 and March 24, 2015 respectively —only days before signing the stock purchase agreements. (Ex. 32; Ex. 33.) These passports would not have been necessary to purchase the EPCC shares; but they may have been useful as identification to open U.S. brokerage accounts and deposit shares. (Darragh Decl. at ¶ 35.)

In addition, a draft escrow agreement stated Hong Kong Corp. was the "representative of certain investors" acquiring 100,202,466 shares of EPCC. A second draft stock purchase agreement for one of the Chinese investors stated that Hong Kong Corp. was "serving as a representative of the purchaser." (Ex. 22; Ex. 23; Ex. 35.) (Darragh Decl. at ¶ 36).

### G.   Creation of IMMG and Reverse Merger into EPCC

According to executives at Company A, sometime in early 2015, an individual, Person A, who claimed to be with Hong Kong Corp., contacted executives at Company A, a reported biotechnology "start-up," seeking outside investment. Person A proposed the creation of IMMG, which would license certain Company A technology relating to cancer immunotherapy. Person A proposed that Person B, whom he described as a colleague and entrepreneur who could help fundraise, be appointed CEO of IMMG. The principals of Company A agreed, but to date they have never met Person A or Person B in person. (Darragh Decl. at ¶ 37).

On April 7, 2015, Founder A appointed Person B as President, Secretary, Treasurer, and member of the board of directors, and resigned from EPCC.  On April 17, 2015, Person B, as sole member of the board, appointed Attorney A as Corporate Secretary and authorized a new bank account for EPCC for which Attorney A was to be the sole signer.  (Ex. 36; Ex. 37; Ex. 38; Ex. 38a).)  (Darragh Decl. at ¶ 38.)

On or about May 11, 2015, Attorney A sent a single set of instructions to Transfer Agent A advising it to transfer the 60,058,909 restricted shares to Hong Kong Corp., and all 39,236,925 shares purportedly held by 37 of the South African investors to the ten Chinese investors. Paperwork for the sale was completed in March 2015, and the restricted shares were sold in early April 2015.  (Ex. 24; Ex. 39.)  The transfer of the restricted shares—and the purportedly unrestricted S-1 shares—was delayed when it came to light that the restricted certificate had been cancelled and the correct certificate was never reissued to Founder A.  On May 7, 2015, Attorney A emailed Transfer Agent A stating, "We have a deal that we tried to close yesterday but need to resolve this first. . . .  I've got many anxious people waiting for me to close this deal."  (Ex. 40.) There does not appear to be any reason why the sale of the shares to the Chinese investors should have been delayed pending resolution of the sale of the block of securities to Hong Kong Corp. except that the Chinese investors and Hong Kong Corp. were acting in concert to obtain control of IMMG.  (Darragh Decl. at ¶ 39.)

On May 12, 2015, EPCC changed its name to Immage Biotherapeutics Corp.  (Ex. 41.) On May 18, 2015, the original shares of 37 of the South African investors were cancelled and issued in the name of the ten Chinese investors (Ex. 24), and in the same transaction, the restricted share certificate was also cancelled and issued to Hong Kong Corp.  (*Id.*)  Attorney A's firm paid the transfer fees.  (Ex. 43.)  (Darragh Decl. at ¶¶ 40, 41.)  On May 21, 2015, EPCC

filed an Article of Merger with the Nevada Secretary of State, "whereby it entered into a merger with its wholly-owned subsidiary [IMMG]."  (Ex. 42 at 4.)  (Darragh Decl. at ¶ 42).

After EPCC changed its name to IMMG, Attorney A sent to Transfer Agent A on June 29, 2015, the shares certificates for the ten Chinese investors and for Hong Kong Corp. asking the Transfer Agent A to reissue the EPCC shares in IMMG's name.  Attorney A wrote that the shares "have never been delivered to the shareholders," and asked for the corrected certificates to be sent to him  (Ex. 98.)  (Darragh Decl. at ¶ 44).

On July 29, 2015, IMMG filed a Form 8-K with the Commission stating that it had, as of the merger, "ceas[ed] to be a 'shell company' . . . ."  (Ex. 44 at 2.)  (Darragh Decl. at ¶ 45).

### H.    Chinese Investors Deposit IMMG Shares in U.S. Brokerage Accounts

Lin and Chen subsequently deposited their shares of IMMG at U.S. brokerage firms Broker A and Broker B, respectively.  Lin began this process on or around July 24, 2015, and Broker A accepted Lin's deposit of IMMG shares on or around August 20, 2015.[2]  (Ex. 30.) (Darragh Decl. at ¶¶ 48, 49.)

Chen's deposit process took longer.  On or around August 27, 2015, Attorney A informed the company that it needed to correct a misspelling in Chen's name and asked it to send to Chen in China the corrected certificate, along with a certificate or another shareholder, Chinese Investor 2.  (Ex. 50.)[3] (Darragh Decl. at 50).

---

[2] In Lin's account opening documents, he stated that one of the other ten Chinese investors, Chinese Investor 1, referred him to Broker A; thus these two investors knew each other.  (Ex. 95.)  Despite recommending Broker A to Lin, Chinese Investor 1 deposited his stock at another broker.  (Ex. 51.)

[3] It is not clear why Attorney A also sent Chinese Investor 2's certificate to the transfer agent, but the fact that both Chen and Chinese Investor 2's certificates were sent to Chen indicates Chen and Chinese Investor 2 knew each other.

On or around September 1, 2015, Chen sought to deposit her shares with Broker B. (Ex. 31 at 0000472.)  In connection with this, Attorney A wrote a letter dated August 31, 2015, in which he said he was "of the opinion that the stock transactions by which the Stock was issued to [Chen] was validly registered pursuant to the Securities Act of 1933." (*Id.* at 0000474-75.) Attorney A stated: "The Holder acquired the Stock from four (4) previous holders . . ., each of whom purchased the Stock directly from the Issuer on or about August 24, 2013, pursuant to an effective Registration Statement filed by the Issuer on Form S-1/A . . . .  Neither the Holder or [sic] the previous holders are or have been affiliates of the Issuer within the last ninety (90) days."  He concluded:  "I am of the opinion that the Holder is able to freely sell the Stock." (*Id.*) On September 14, 2015, Chen's deposit of 3,897,621 shares was approved by Broker B. (*Id.* at 0000468.) (Darragh Decl. at ¶ 51).

Lin sent $1,038 to Broker A to open the account; $925 of which was used to pay for the fees to deposit his IMMG stock.  Chen sent $1,000 to Broker B to open her account; $985 of which was used to pay for the fees to deposit her IMMG stock.  The only other assets deposited into Lin's and Chen's accounts were shares of IMMG and the only trading that has occurred in those accounts is sales of IMMG securities.  Thus, all remaining monies currently in those accounts represent proceeds from their trading in IMMG securities.  (Ex. 99; Ex. 100.)  (Darragh Decl. at ¶ 52).

Five other investors also deposited their shares with brokers located outside of the United States.  (Exs. 51-55.)  Attorney A's credit card was used for the deposit fees for four of these deposits.  (*Id.*)  (Darragh Decl. at ¶ 53).

I.     **Trading In IMMG and Promotional Campaign**

IMMG appears to have first traded on September 14, 2015.  (Ex. 68.)  Over the following

year, IMMG traded on only 20 days, from prices ranging from $0.15 to $0.42, and average

volume on days traded of only 2,617 shares.  (*Id.*)  Beginning in late January 2017, the trading

volume for, and price of, IMMG's shares rose on trading that does not coincide with any public

news or corporate announcement.  (*Id.*)  (Darragh Decl. at ¶ 55.)

IMMG issued press releases on September 13, 2016, November 28, 2016, January 6,

2017 and February 16, 2017.  (Exs. 89-93.)  No IMMG shares traded on any of these days except

January 6, 2017, when 300 shares traded.  (Ex. 68.)  (Darragh Decl. at ¶ 56.)  Beginning on

January 30, 2017, however—although no public news or filing by IMMG was issued—trading

volume and IMMG's share price both increased markedly.  (*Id.*)  Both Lin and Chen increased

their sales beginning on January 30, 2017.  (Ex. 58; Ex. 59.)  (Darragh Decl. at ¶ 57.)

Beginning on March 25, 2017, until the trading was suspended on April 4, 2017, there

was a concerted promotional campaign, tied to a press release issued by IMMG after market

close March 27, 2017.  (Exs. 71-88.)  IMMG's press release stated, in part, that its

immunotherapy had "successfully passed early toxicology and efficacy studies" in mice and that

the results would help the company "move forward with [their] conversations with the FDA."

(Ex. 93.)  The promotional campaign began on March 25, 2017 before the March 27, 2017 press

release was issued, however, indicating the individual or individuals sending at least some of the

promotional emails may have known IMMG was going to issue the press release.  (Darragh

Decl. at ¶¶ 58-64.)

Volume increased dramatically and the price increased to as high as $1.62 (Ex. 68), as at

least three promotional web-sites sent emails to their subscriber lists touting IMMG with at least

16 promotional emails.  (Darragh Decl. at ¶ 58, 64.)  Moreover, these promotional emails contained, at a minimum, materially misleading statements.  Two used identical language in emails (suggesting coordination), claiming, "This biotech [IMMG] may be on the cusp of getting FDA approval for its cancer therapies."  (Ex. 73; Ex. 86.)  (Darragh Decl. at ¶ 61, 63.)  But IMMG's March 27 press release announced only that it had had some success with mice and hoped to move forward in "conversations" with the FDA, and its January 6, 2017 press release made clear that no applications with the FDA were even pending and that IMMG had only "plans to file for the FDA's IND program for approval into Phase 1 human trials in mid-2018." (Ex. 93; Ex. 91.)  (Darragh Decl. at ¶ 61.)  Another used similar misleading language— particularly in light of IMMG's public statements on January 6, 2017 that made clear that no applications with the FDA were even pending—informing those receiving the email, "IMMG seems to be on the verge on [sic] curing cancer according to its latest press release."  (Ex. 83.) (Darragh Decl. at ¶ 62.)

Between March 28 and April 3, 2017, IMMG's average daily volume was 1,771,165, with a low of $0.40 and a high of $1.62.  (Ex. 68.)  From March 28, 2017 through April 3, 2017, Lin sold approximately 1.28 million shares for net profits of approximately $1.11 million dollars, and Chen sold approximately 660,000 shares for net profits of approximately $486,000.  (Ex. 58; Ex. 59.)  (Darragh Decl. at ¶ 65.)

On April 4, 2017, the Commission suspended trading in IMMG stock for ten business days "because of concerns regarding the accuracy and adequacy of information in the market place and potentially manipulative transactions in IMMG's common stock."  (Ex. 67.)  (Darragh Decl. at ¶ 67.)

### J.    Lin's Trading

After depositing his 4,526,067 IMMG shares in August 2015, Lin made low-volume

trades in 2015 and 2016.  (Ex. 58.)  Lin traded on four days in 2015 and seven days in 2016,

selling less than 20,000 shares total and at most 4,440 shares at a time.  (*Id.*)  Daily average

prices for Lin's sales during this time ranged from $0.165 to $0.42.  Beginning in late January

2017, Lin began selling more shares.  (*Id.*)  On February 9, 2017, just two business days after his

funds became available from his recent sales, Lin wired $65,000 funds out of his account to a

bank in Hong Kong.  (Ex. 60.)  (Darragh Decl. at ¶ 68.)

From January 31, 2017 to March 21, 2017, Lin sold IMMG shares on ten days, with an

average 18,774 shares per day, at daily average prices ranging from $0.2543 to $0.7755 per

share.  (Ex. 58.)  (Darragh Decl. at ¶ 69.)

From March 28, 2017, through April 3, 2017, Lin sold a total of 1,279,734 shares in five

days, at daily price averages ranging from $0.65 to $1.47 per share.  (*Id.*)  On March 28 (the first

day of the promotional campaign), Lin sold 664,000 shares for net proceeds of $416,080.  (*Id.*)

On April 3, 2017, the first day the proceeds from the March 28 selling became available, Lin

wired $458,000 to the bank in Hong Kong.  (Ex. 61.)  (Darragh Decl. at ¶ 70.)  In total, Lin sold

1,486,734 shares for $1,226,205.48 (net of fees), with a cost basis of $5,555.92.  (Ex. 58.)  Thus,

his profit on these shares was $1,220,649.56, for a profit of approximately $0.82 per share.  (*Id.*)[4]

(Darragh Decl. at ¶ 71.)

---

[4] Lin intended to sell much more.  On April 3 he traded 277,000 shares at an average price of $1.4745, but he had placed orders to sell up to 200,000 shares at prices from $1.63 to $1.72.  (Ex. 57.)  Before the market opened on April 4, Lin sent his broker sell orders at progressively rising prices from $1.26 to $1.36 starting at 5,000 units and increasing to 8,000 units.  (*Id.*)  These 73,000 share hoped-for sales could not occur because the trading was suspended.

On April 4, 2017, around 8:52 am, prior to the suspension order taking effect, Lin emailed Broker A to place 11 additional sell orders at prices ranging from $1.26 to $1.36. These orders were not executed (Ex. 57.) (Darragh Decl. at ¶ 72.) The day after the suspension, on April 5, 2017, Lin requested that Broker A wire out the $311,000 of cash that had cleared in his account that day to his Hong Kong bank account. (Ex. 63.) The next day, April 6, when approximately $400,000 more became available, Lin asked if he should change the wire to reflect all the cash available. (Ex. 64.) However, Broker A did not process the wire transfer requests. As of April 24, 2017, Lin currently has $703,218 in proceeds from the sales of his IMMG shares and 3,039,333 remaining IMMG shares deposited with Broker A. The wires that Lin attempted to initiate on April 5 and April 6 represent the proceeds from Lin's sales of IMMG. (Darragh Decl. at ¶ 73.)

There were no registration statements filed or in effect with respect to the sales by Lin to the public. (Darragh Decl. at ¶ 74.) The securities sold by Lin were sold through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks. (Darragh Decl. at ¶ 75.)

### K.   Chen's Trading

After depositing her 3,897,621 IMMG shares in September 2015, Chen traded in 2015 and 2016. Chen sold IMMG shares on two days in 2015, November 12 and 18, when she sold a total of 5,000 shares for $0.25 per share. (Ex. 59.) She did not sell any IMMG shares again until January 30, 2017. From January 30, 2017 to March 1, 2017, Chen sold 218,000 shares over 12 days (at an average of 18,167 shares per day) at an average price of approximately $0.47 per share. (*Id.*) On or around March 6, 2017, Chen wired $97,000 from her brokerage account to

the Hong Kong bank, the same bank to which Lin transferred his proceeds.  (Ex. 65.)  From March 28 to March 31, 2017, she sold a total of 664,300 IMMG shares at daily average prices ranging from $0.61 to $1.1286.  (Ex. 59.)  On March 31, 2017, Chen requested to wire $325,000 from her account to the Hong Kong bank, but Broker B was unable to meet her request because it was having problems at that time processing international wire transfers.  (Ex. 66.)  When the Commission suspended trading of IMMG, the introducing broker-dealer put a hold on activity in Chen's account.  (Darragh Decl. at ¶ 76.)

In total, Chen sold 887,300 shares for $586,044.63 (net of fees), with a cost basis of $3,315.84, for a profit of $582,728.79 and an approximate $0.65 profit per share.  (Ex. 59.)  As of April 21, 2017, Chen has $488,502.46 in proceeds from the sales of her IMMG shares and 3,010,321 remaining IMMG shares deposited with Broker B.  (*Id.*)  (Darragh Decl. at ¶ 78.)

On April 3, 2017, Chen placed an order to sell an additional 100,000 shares of IMMG which was unexecuted.  (Darragh Decl. at ¶ 79.)  On April 19, 2017, after the 10 day trading suspension had elapsed, Chen sought to sell shares on the grey market through Broker B, but Broker B refused to do so.  (*Id.* at ¶ 80.)  There were no registration statements filed or in effect with respect to the sales by Chen to the public.  (*Id.* at ¶ 81.)  The securities sold by Chen were sold through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.  (*Id.* at ¶ 82.)  Chen sold IMMG shares to a broker-dealer located in Manhattan, New York on, for example, February 8, 2017.  (Ex. 70.)  (Darragh Decl. at ¶ 77.)

## ARGUMENT

I. **DEFENDANTS' ASSETS SHOULD BE FROZEN TO ENSURE SUFFICIENT ASSETS WILL BE AVAILABLE AND WITHIN THE COURT'S JURISDICTION TO SATISFY A JUDGMENT.**

### A. The Burden for the SEC to Obtain an Asset Freeze is Not Onerous.

In this emergency action, the Commission seeks an immediate asset freeze. Such relief turns, in part, on the showing of at least an inference that Defendants have violated the securities laws. *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Cavanagh*, 155 F.3d 129, 132, 135 (2d Cir. 1998). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *SEC v. Byers*, No. 08 Civ. 7104, 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (quotation omitted). The Second Circuit emphasized in *SEC v. Unifund SAL* that "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." 910 F.2d 1028, 1041 (2d Cir. 1990). This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.*; *see also Byers*, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction.").

Upon making the required showing, the SEC is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." *SEC v. Maillard*, No. 13 Civ. 5299, 2014 WL 1660024, at *4 (S.D.N.Y. April 23, 2014). Section 20(d)(2) of the Securities Act authorizes a civil penalty up to the amount of the pecuniary gain to the defendant as a result of the violation. 15 U.S.C. § 77t(d)(2).

**B.**   **The Commission Has Established a *Prima Facie* Violation of Section 5**

Section 5(a) of the Securities Act prohibits the sale of securities in interstate commerce unless pursuant to an effective registration statement.  15 U.S.C. § 77e(a).  In addition, Section 5(c of the Securities Act makes it unlawful to offer to sell securities, through the use or medium of a prospectus or otherwise, unless a registration statement has been filed as to such security.  15 U.S.C. § 77e(c).  A *prima facie* Section 5 violation requires proof of three elements:  first, that no registration statement was filed or in effect as to the securities; second, that the defendant sold or offered to sell these securities; and third, that there was a use of interstate means in connection with the offer or sale.  *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998).  Once the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration was available for the offer or sale of the security.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *see also SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) ("Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption.").  "Scienter is not an element of a section 5 violation, the defendants bear the burden of proving that an exemption applies."  *See id.*; *SEC v. Universal Major. Indus.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

"Registration is 'transaction-specific,' in that the requirement of registration applies to each offer or sale of a security.  Proper registration of one offering does not necessarily suffice to register subsequent offerings of the security."  *SEC v. Cavanagh*, 155 F.3d at 133; *SEC v. Universal Express, Inc.*, 415 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (holding that registration is "'transaction-specific,' in that the requirement of registration applies to each

act of offering or sale; proper registration of a security at one stage does not necessarily

suffice to register subsequent offers or sales of that security) (citing *Cavanagh*, 155 F.3d at

133). This is also the Commission's view regarding registration of securities. *See, e.g.*, *In*

*re Gordon Brent Pierce*, Exchange Act Rel. No. 71664, 2014 WL 896575, at *10 (Mar. 7,

2014).

The registration requirement and its exemptions apply to transactions, not to

individuals or securities. *SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949, at *10

(S.D.N.Y. Dec. 9, 2013) ("section 4(1) provides an exemption for transactions, not

individuals"); *SEC v. Czarnik*, No. 10 Civ. 45, 2010 WL 4860678, at *11 (S.D.N.Y. Nov.

29, 2010) (same). Additionally, "[r]egistration exemptions are construed strictly to

promote full disclosure of information for the protection of the investing public."

*Cavanagh*, 445 F.3d at 115; *accord SEC v. Verdiramo*, 890 F. Supp. 2d 257, 266 (S.D.N.Y.

2011) (same); *SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *19 (S.D.N.Y. Aug.

25, 2011) (same).

The Defendants engaged in *prima facie* violations of Sections 5(a) and 5(c) of the

Securities Act. No registration statement was in effect for the sales of securities by the

Defendants in 2015, 2016 and 2017, (Darragh Decl. at ¶¶ 74, 81), who sold and offered to

sell to the public market through the facilities of the U.S. over-the-counter inter-dealer

market, which consist of numerous broker-dealer firms that execute transactions through

interstate telecommunications networks. (Darragh Decl. at ¶¶ 75, 82.) Thus, there is a

*prima facie* case that the Defendants violated Sections 5(a) and 5(c).

### C.   EPCC's S-1 Filing Does Not Apply to the Defendants' Sales

Because registration of securities is transaction-specific, EPCC's Form S-1 does not give the Defendants leave to resell or offer to sell their purchased securities without registration.  Defendants must find and prove their entitlement to their own exemption.  Thus, the Defendants will not be able to argue that the EPCC S-1 registration statement was effective as to their resales.[5]

### D.   The Defendants Will Not Be Able to Establish an Exemption From Registration

The Defendants will likely not be able to meet their burden of establishing that their sales of IMMG securities to the public were exempt from the registration requirement.  Section 4(a)(1) of the Securities Act provides an exemption from registration for "transactions by any person other than an issuer, underwriter or dealer."  15 U.S.C. § 77d(a)(1).  A party is an underwriter under Section 2(a)(11) if he purchases shares "from an issuer with a view" to distribute them to the public *or* if he sells shares "for an issuer in connection with[] the distribution of any security."  15 U.S.C. § 77b(a)(11).[6]  The term "issuer" for purposes of Section 2(a)(11) includes: "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."  *Id.*

---

[5] After a *bona fide* transaction registered on a Form S-1 is completed, the public *re*sale of the securities may be exempt from liability—not because of the Form S-1 itself—but under the ordinary market trading exemption of Section 4(a)(1), discussed below.

[6] A distribution occurred as shares were deposited by Defendants into their trading accounts and these shares were sold to the public.  *See e.g., R. A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) ("'Distribution' comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'") (*quoting Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)).

In documents submitted to their broker-dealers in part to provide evidence that they owned shares that could be deposited and sold to the public, the Defendants cited to the Form S-1 registration statement that EPCC filed.  (Darragh Decl. at ¶¶ 33, 51).  Thus, Defendants may argue that their resales were exempt from registration because they purchased those shares from the purported South Africans investors (who purportedly purchased their shares in a registered transaction from EPCC) and they cannot therefore be underwriters because they did not purchase their shares from an issuer.  The Defendants or their representatives have represented to their brokers that they are not "affiliates" of IMMG (Darragh Decl. at ¶¶ 49, 51).  Thus, they may alternatively attempt to argue that their sales were exempt under the Rule 144 safe harbor discussed below.  17 CFR 230.144.  Defendants will not be able to meet their burden of proof establishing either exemption from registration.

### 1.    The Transaction Registered on EPCC's Form S-1 Never Occurred

Defendants likely argument that they purchased from the South African investors and not from the "issuer" as defined by Section 2(a)(11) will fail because there was no *bona fide* transfer of securities from EPCC to the South Africans investors.  Therefore, the transaction that EPCC registered on the Form S-1 never took place, and the securities remained under the control of the issuer or its persons controlling or controlled by the issuer.

Although share certificates were issued in the names of the purported South African investors, it is unlikely that the Defendants will be able to prove that a registered distribution took place because the available evidence indicates that the shares remained with the issuer or persons "directly or indirectly controlling or controlled by the issuer, or

21

any person under direct or indirect common control with the issuer." First, Commission

staff has spoken to two of the purported investors (one of whom sold to one of the

Defendants) and both denied purchasing shares of EPCC. Second, the available payment

information for 34 of the 38 purported South African investors does not show that they

paid for the shares with their own funds. Third, there is no known evidence that the shares

were ever sent to the purported investors or were under their control. Fourth, the purported

investors never signed the shares certificates, and the sales documents they signed had

blanks and missing information, suggesting they were signed before any actual resale took

place. Fifth, all of the sales documents were notarized by the same person, suggesting at a

minimum coordination, if not fraud (one investor said he did not sign any documents

before a notary). Sixth, all of the purported South African investors sold their shares as

part of a coordinated sale to the ten Chinese investors (which was also coordinated with the

issuer's sale of the controlling, restricted shares of the company to the Hong Kong

Corporation). Finally, the escrow accounts for the attorney who coordinated the sale from

the South African investors to the Chinese investors contain no evidence that any of the

sale proceeds were sent to the South African investors.

       Thus, the sale of EPCC's shares to the South African investors never took place. As

a result, the Chinese investors purchased restricted shares from the issuer, or persons

controlled by or under common control with the issuer, such that the Chinese investors fall

under the definition of "underwriter." And, because they purchased from an issuer,

Defendants will need to, but cannot, establish that they qualify for the safe harbor from

being deemed an underwriter (discussed below) or otherwise establish that they are not an

underwriter because they either did not have a "view to distribute the shares to the public"

*or* because they were not selling "for an issuer in connection with[] the distribution of any security."

### 2.      Defendants Do Not Qualify for Rule 144 Safe Harbor

Defendants may argue that even if they purchased from an issuer, they are not underwriters because they fall under the safe harbor from being deemed an underwriter set forth in Rule 144 of the Securities Act.  If a reseller of restricted securities (those that were acquired directly or indirectly from the issuer) complies with the Rule 144 safe harbor, the reseller will not be considered to be engaged in a distribution of securities, and therefore will be deemed not to be an underwriter.  The Defendants cannot rely upon those provisions of Rule 144 applicable to sales of restricted securities, however, because the issuer does not meet the requirements of Rule 144(i) concerning former shell companies.

Under Rule 144(i)(1), the Rule's safe harbor is not available for the resale of securities initially issued by a "shell company," which is defined by Rule 144(i) and Rule 405 (17 CFR 230.405)  as an issuer that has (1) no or nominal operations; and (2) no or nominal assets, or assets consisting solely of cash or cash equivalents, or assets consisting of any amount of cash and cash equivalents and nominal other assets.  Under Rule 144(i)(2), the Rule 144 safe harbor is available to a reseller of securities of a former shell company issuer only if certain enumerated conditions are met, including that the issuer: (1) has ceased to be a shell company; (2) is subject to Exchange Act Section 13 or 15(d) reporting requirements; (3) has filed all reports required by Exchange Act Section 13 or 15(d), as applicable, during the preceding 12 months, other than Form 8-K reports; and (4) has filed current Form 10 information with the Commission reflecting the issuer is no longer a shell company.  In addition, one year must have elapsed from the date such former

shell company issuer filed its Form 10 information indicating that it is no longer a shell company before anyone reselling such issuer's securities can avail themselves of the Rule 144 safe harbor.

The Defendants' sale of IMMG securities must meet the enumerated requirement of Rule 144(i)(2) because IMMG was a shell company, EPCC, at the time the Defendants purchased the stock. EPCC not only met the definition of a "shell company," but also stated it was a shell in its SEC filings. (Darragh Decl. at ¶ 9 and Ex. 2.) Defendants cannot show that their sales met the requirement of 144(i)(2) that the company, whose securities they were selling, was a company subject to Exchange Act Section 13 or 15(d) ) reporting requirements. At the time of their sales, IMMG was not subject to Exchange Act Section 13 or 15(d) reporting requirements. Specifically, IMMG did not register its securities under Section 12 of the Exchange Act, 15 U.S.C. § 78l, which would subject it to reporting requirements of Section 13. IMMG had been subject to the reporting requirements of Section 15(d) from the time its S-1 went effective on July 31, 2013, until the end of that fiscal year, September 30, 2013. Thereafter, IMMG's 15(d) reporting obligations were suspended as a matter of law pursuant to Section 15(d) of the Exchange Act because the reporting requirements would only continue if it had had 300 or more record holders. Accordingly, IMMG did not meet the requirements of Rule 144(i) when the Defendants sold their shares in 2015 through April 2017, because IMMG was not subject to reporting requirements; thus, they cannot rely on the Rule 144 safe harbor from the definition of underwriter.[7]

---

[7] Even if IMMG was subject to Section 13 or 15(d) reporting requirements at the time of Defendants' sales (which IMMG was not), as to certain of their sales, the Defendants would not be able to satisfy the additional 144(i) safe harbor requirement that securities must not be sold until after one year has elapsed from the date that IMMG filed information stating that it was no

### 3.     The Defendants Were Underwriters Under Section 4(a)(1)

The Defendants do not otherwise qualify for the registration exemption under

Securities Act.[8] For example, Defendants also cannot plausibly argue that, even if they

purchased their shares from the issuer, they are not underwriters because they did not

purchase the shares with the intent to distribute (as required to be deemed an underwriter).

Courts have defined the term "distribution," as used in Securities Act Section 2(a)(11) as

the entire process by which securities from an issuer are dispersed and come to the hands

of the investing public; thus, the term "distribution" is equivalent to a "public offering."

*See In the Matter of Oklahoma-Texas Trust*, 2 S.E.C. 764 (1937), *aff'd*, 100 F.2d 888 (10th

Cir. 1939).  The Commission has described a distribution as continuing throughout "the

entire process by which in the course of a public offering the block of securities is

dispersed and ultimately comes to rest in the hands of the investing public." *SEC v. Kern*,

425 F.3d 143, 152-153 (2d Cir. 2005) (citing *R.A. Holman & Co. v. SEC*, 366 F.2d 446,

449 (2d Cir. 1966) (quoting *Lewisohn Copper Corp.* 38 S.E.C. 226, 234 (1958)).

---

longer a shell. On July 29, 2015, IMMG filed information indicating that it was no longer a shell (Darragh Decl. ¶ 45) so any sales from that date through July 29, 2016 would also not be able to qualify under this additional holding period requirement for the 144(i) exemption.

[8] "While conduct can satisfy Section 4(1) without meeting the requirements of Rule 144 (which is a nonexclusive safe harbor provision) . . . sellers seeking a Section 4(1) exemption outside Rule 144 face a difficult standard." *SEC v. Cavanagh*, 445 F.3d 105, 114 (2d Cir. N.Y. 2006). "As the SEC Release announcing Rule 144's adoption warned, 'persons who offer or sell restricted securities without complying with Rule 144 *are hereby put on notice* by the Commission that in view of the broad remedial purposes of the Act and of public policy which strongly supports registration, they will have *a substantial burden of proof* in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers and other persons who participate in the transactions do so at their risk.'" *Id.* (citing Notice of Adoption of Rule 144, 1933 Act Release No. 33-5223, Fed. Sec. L. Rep. (CCH) P78,487, at 81,050 (Jan. 11, 1972)) (emphasis in original).

In determining whether there was a "view to distribute" shares at the time of acquisition, "Courts frequently employ an objective two-year holding period rule of thumb to determine whether a seller acquired shares with a view to distribution." *SEC v. ConnectAJet.com, Inc.*, No. 09 Civ. 1743, 2011 WL 5509896, at *5 (N.D. Tex. Nov. 9, 2011); *see also, e.g., Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989); *SEC v. Olins*, No. 07 Civ. 6423, 2010 WL 900518, at *2 (N.D. Cal. Mar. 12, 2010).  In *ConnectAJet.com*, the Court granted summary judgment to the Commission and determined that there was no issue of material facts as to whether there was a view to distribute where "Page and his proxies started reselling their shares to the public within days of receiving the shares, selling 1.2 million shares in less than one week and 4.3 million shares in less than six months.  Although Page did buy 75,000 shares of CAJ stock on the open market and did not sell all of his stock to the public, such actions do not merit disregard of the normal two-year holding period rule of thumb." *Id.* at *5.

Here, the Defendants did not hold for two years before starting to sell their positions. Instead, they deposited and started selling shares of IMMG within six months from acquiring their shares for Lin and eight months for Chen.  Thus, they cannot say they held onto their investments for the "two-year holding period rule of thumb," which undermines any argument they may make that they did not have a view to distribute the shares.

Both Lin and Chen purchased their shares under separate stock purchase agreements dated March 31, 2015.  Both were issued passports shortly before the sale that were used to open brokerage accounts, which is some evidence that their intent was to *not* hold the shares as an investment but to deposit them into a brokerage account to trade them for profit.  And this is what they each did.  On July 24, 2015, approximately four months after

acquiring the shares, Lin sought to deposit the shares with Broker A. Lin began selling

shares on September 14, 2015, less than six months after he acquired the shares. Lin traded

on four days in 2015 and seven days in 2016. Lin submitted offers to sell (that were not

executed at the time) on April 22, 2016 and on June 13, 2016, evidencing his intent to sell.

From January 31, 2017 to March 31, 2017, Lin sold a total of 1,467,469 IMMG shares. All

of these sales were within two years from the date he acquired the shares on March 31,

2015.

On August 31, 2015, approximately five months after acquiring the shares, Chen

sought to deposit her shares with Broker B. Chen sold a total of 5,000 shares on November

12, 2015, less than eight months after she acquired the shares. On April 22, 2016, she

placed limit orders to sell a total of 7,000 shares and on June 16, 2016, she submitted limit

orders to sell a total of 22,000; none of these orders in 2016 were executed as trades, but

they evidence her intent to sell. From January 30, 2017 to March 31, 2017, Chen sold a total

of 882,300 IMMG shares. All of these sales were within two years from the date she acquired

the shares on March 31, 2015.

Also, the evidence regarding the Defendants dramatically increased sales into the

public market in conjunction with a promotional campaign, that, at a minimum, was

materially misleading, and the Defendants' efforts to quickly transfer their profits out of

the country, supports a finding that they purchased their shares with the intent to sell them

for profit, not hold them for investment, especially when combined with the other evidence

summarized in this section.[9]

---

[9] Further, "[i]rrespective of whether a seller of an unregistered security purchased with a view to
distribution, such seller may be held liable under the Act as an underwriter where the sale is

Thus, the Defendants acquired IMMG securities from the issuer or its affiliates with

a view to resell the securities to public investors and, in fact, did resell the securities to

public investors. Accordingly, the Defendants were underwriters within the meaning of

Securities Act Section 2(a)(11).

Thus, given the strong inference of violations of Section 5 presented by the evidence

here, an asset freeze should enter.

**E.      An Asset Freeze Order Should Enter Because of the Serious Risk that the**
**Substantial Proceeds of the Trading Will Be Transferred Offshore.**

An asset freeze is particularly appropriate here given the clear risk of imminent asset

dissipation, especially considering Defendants' capacity to transfer funds beyond the jurisdiction

of the Court. *See, e.g., SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d. 402, 420 (S.D.N.Y. 2001)

(defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a

danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his

account did not remain frozen") (citing *De Beers Consolidated Mines, Ltd. v. United States*, 325

U.S. 212, 215-16 (1945) (holding in antitrust action, that "sequestration of [defendants'] property

is the only means of enforcing this Court's orders or decree against said foreign corporate

defendants. The principal business of said defendants is carried on in foreign countries and they

could quickly withdraw their assets from the United States and so prevent enforcement of any

---

made for an issuer in connection with[] the distribution of [the] security." *Olins,* 2010 WL
900518, at *3 (internal quotation marks omitted). "The law is clear . . . that an individual can be
an underwriter merely by taking part in the transfer of the security from the issuer to the
investing public, regardless of his intentions at the time he acquires the stock." *SEC v. Offill*, No.
07-cv-1643, 2012 WL 246061, at *5 (N.D. Tex. Jan. 26, 2012) (citing *SEC v. Sierra Brokerage
Servs.*, Inc., 608 F.Supp.2d 923, 952 (S.D. Ohio 2009).) Given Defendants' role as a link in the
chain of what appears to be one continuous distribution from the issuer in 2013 through the
putative South Africans in 2015 to the investing public, during a promotional campaign in 2017,
additional evidence may show that Defendants, knowingly or otherwise, sold for the issuer in
connection with a distribution.

order or decree which this Court may render."); *SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) (freezing the assets of a foreign citizen to avoid dissipation of assets); *SEC v. Well Advantage Ltd.*, No. 12 Civ. 5786, Docket Nos. 15, 35 (S.D.N.Y. Aug. 6 & 22, 2012) (freezing the assets of a foreign citizen to avoid dissipation of assets); *SEC v. Am. Board of Trade, Inc.*, 645 F. Supp. 1047 (S.D.N.Y. 1986) (entering an order freezing all assets of unregistered commercial paper program which had been found to be unlawful).

The Commission has a compelling interest in bringing civil actions to enforce the securities laws and collect on any obtained judgment. Given Defendants' ability to remove assets outside of the Court's jurisdiction and what the Commission's alleges to be ill-gotten gains in United States financial accounts, there is significant risk that Defendants will wire their funds offshore and deny the Commission the ability to obtain effective relief.

II.    **EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE IS NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING REQUESTED BY THE COMMISSION.**

The Commission also requests that the Court set this matter for a hearing on an order to show cause prior to the expiration of the requested asset freeze. To allow it to prepare for that hearing, the Commission requests that the Court order expedited discovery. *See Sonja Anticevic*, 2005 WL 1939946 (ordering expedited discovery in connection with an asset freeze and order to show cause to a foreign defendant).

The Commission also requests that the Court permit alternative means of service, specifically, service by email. Alternative service by email on a foreign citizen is appropriate when the Commission obtains an order to show cause and an asset freeze. *See SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348, at *1 (S.D.N.Y. April 21, 2014) (granting an order to

show cause, asset freeze, and service by e-mail on a foreign citizen for alleged securities laws violations). Federal Rule of Civil Procedure 4(f)(3) allows service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders." "Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted). "The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.'" *United States v. Lebanese Canadian Bank*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting *Madu*, 265 F.R.D. at 115). Further, a "plaintiff is not required to attempt service through the other provisions of Rule 4(f) before the Court may order service pursuant to Rule 4(f)(3) . . . ." *F.T.C. v. Pecon Software Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272, at *4 (S.D.N.Y. Aug. 7, 2013). Alternative service is appropriate where traditional service under the Hague Convention would take numerous months. *In re GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262, 266-67 (S.D.N.Y. 2012) ("Courts have frequently cited delays in service under the Hague Convention as supporting an order of alternative service under Rule 4(f)(3).") (citing cases); *see also Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[T]he advisory notes [to Rule 4] suggest that in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods remain incomplete or unattempted.").

The delays in service under the Hague Convention here would unduly burden the parties' ability to address the requested show cause order and the Commission's request for preliminary relief.

The core consideration under Rule 4(f) is whether service is "reasonably calculated to give notice" to Defendants.  Fed. R. Civ. P. 4(f).  Service by email is reasonably calculated to reach Defendants because they both included email addresses with their brokerage account applications and communicate regularly with their brokers by email.

## CONCLUSION

For all of the foregoing reasons, the Commission requests that this application be granted.

Dated: April 26, 2017

Kevin P. McGrath
Jennifer K. Vakiener
Hane L. Kim
Steven G. Rawlings
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street
New York, N.Y. 10281
(212) 336-0533 (McGrath)
mcgrathk@sec.gov