Andrew M. Calamari
Lara Shalov Mehraban
Steven G. Rawlings
Kevin P. McGrath
Jennifer K. Vakiener
Hane L. Kim
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, N.Y. 10281
(212) 336-0100

17 CV 3054

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 17 Civ.   (   ) |
| Plaintiff, | **DECLARATION OF JOSEPH DARRAGH IN SUPPORT OF *EX PARTE* EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE, FOR AN ASSET FREEZE, AND OTHER RELIEF** |
| - against - | |
| WENSHENG LIN and SHENG LI CHEN, | |
| Defendants. | **ECF CASE** |

I, Joseph Darragh, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a Management and Program Analyst for Plaintiff Securities and Exchange

Commission ("SEC").  I have been employed by the SEC since September 2015, and previously

worked as a contractor at the SEC from November 2013 through August 2015.  I serve as an

investigator on the Microcap Fraud Task Force.  My duties include financial and trading

analysis, document review, phone record analysis and interviewing witnesses, among other

things, in order to assist SEC investigations into whether there have been violations of the federal

securities laws.

2.     Prior to joining the SEC, I worked for four years as a Revenue Officer at the Internal Revenue Service's Bridgeport, CT office. I received a B.B.A. in Finance, with a minor in Economics, from Pace University in 2009, and an M.S. in Accountancy from the University of Phoenix in 2010. In July 2013, I was accredited as a Certified Fraud Examiner by the Association of Certified Fraud Examiners.

3.     In March 2016, I was assigned to assist in an investigation. Through this investigation, I obtained facts relating to Immage Biotherapeutics Corp. (ticker symbol "IMMG").

4.     I make this Declaration in support of the *Ex Parte* Emergency Application for an Order to Show Cause, for an Asset Freeze, and Other Relief against Defendants Wensheng Lin ("Lin") and Sheng Li Chen ("Chen").

5.     I am familiar with the facts and circumstances herein. I make this Declaration based upon, among other things: (i) my review and analysis of trading information in IMMG; (ii) interviews myself and other Commission staff conducted of principals and investors in IMMG or its predecessor company; (iii) my review and analysis of brokerage records produced by broker-dealers holding accounts in the name of Lin and Chen; (iv) my review and analysis of documents produced by IMMG; (v) my review and analysis of the Electronic Data Gathering, Analysis, and Retrieval system ("EDGAR"), an online system for the receipt, acceptance, dissemination, and analysis of SEC-mandated filings, and (vi) my review and analysis of press releases and promotional emails relating to IMMG.

## I.     THE DEFENDANTS

6.     **Wensheng Lin**, age 23, resides in the Guandong province of China. According to his new account documents, Lin is an Assistant Engineer at Shantou Jinping Sunny Machinery

Factory, which deals with machinery, industrial parts, and tools. (Ex. 95 (Lin's account opening documents at Broker A).) Lin's email addresses are wensheng1993@hotmail.com and wensheng28435@163.com. (*Id.*; Ex. 64 (email chain between Lin and Broker A, Apr. 4, 2017 to Apr. 6, 2017).)

7. **Sheng Li Chen**, age 32, resides in the Guandong province of China. According to her new account documents, Chen is a Deputy Sale Manager at Donguan Keguan Mechanical and Electrical Co. Ltd. (Ex. 96 (Chen's account opening documents at Broker B).) Chen's email address is chenslslsl@sina.com. (*Id.*)

## II.  FACTS

### A.  Formation of Initial Shell Company EPCC

8. IMMG began as Epicure Charcoal, Inc. ("EPCC"), which was incorporated in Nevada on June 21, 2012. (Ex. 1 (incorporation information from Nevada's Secretary of State's website).) [1] EPCC claimed it was a "development-stage company that intends to sell [its] own brand of Charcoal products for BBQ and restaurant grilling purposes." EPCC's filings identify Founder A as the company's founder and sole officer and director. (Ex. 2 (Form S-1, filed Dec. 10, 2012) at 5.) Founder A purchased 5,000,000 restricted shares at $0.001 per share on September 30, 2012, for a total of $5,000. (*Id.* at 33). Founder A did not have any experience in the charcoal industry. (Ex. 3 (Form 10-K, filed Jan. 9, 2015) at 21; Ex 4 (Form 211 application package at F_000043).)

---

[1] References to "Ex." throughout this Declaration are to true and correct copies of each such document. Each document was either produced to the Commission staff by broker-dealers, transfer agents, and individuals who received emails referencing EPCC, or obtained by the staff from publicly available sources.

**B.**     **EPCC S-1 Offering and Sale to South African Investors**

9.     On December 10, 2012, EPCC filed a Form S-1 registration statement with the Commission, seeking to register the sale of 4,500,000 shares of common stock at $0.04 per share. (Ex. 2 (Form S-1) at 2.) Form S-1 is an initial registration form for the public offer and sale of securities by companies and is used when no other form is authorized or prescribed. (Form S-1, General instructions (17 CFR 239.11).) In my experience, once a Form S-1 becomes effective, a market maker obtains clearance from FINRA to publish stock quotations for its shares. The EPCC Form S-1 registration went into effect on July 31, 2013, after three amendments. (Ex. 5 (Notice of Effectiveness for Epicure Charcoal, Inc., Form S-1, filed July 31, 2013).) EPCC stated in the Form S-1 that it was a shell company: it "has not yet implemented its business model and to date has generated no revenues." (Ex. 2 (Form S-1) at 5.)

10.     On August 8, 2013, EPCC appointed a South African national as Secretary of the Corporation ("SA Secretary"). (Ex. 3 (Form 10-K) at 20.) According to EPCC's public filings, the SA Secretary was a full-time high school student from 2008 to 2012 and helped to market his high school to prospective students and, during school holidays, helped to market "raw cotton product after harvesting." (*Id.* at 21.) As of January 2013, the SA Secretary was studying marketing at the University of the Free State. (*Id.*) On April 19, 2017, the staff contacted the SA Secretary by phone. When asked if he was familiar with EPCC, he answered yes and that he was the secretary of the company. He then said, "Hello….hello…," and the call was disconnected. He has not answered the staff's subsequent calls.

11.     In and around August and September 2013, 38 individuals, all based in South Africa and reported to be friends or family of the SA Secretary or co-workers of his mother, purportedly entered into Subscription Agreements to purchase a total of 147,042 shares of EPCC

from the company for a total of $5,911.03. The number of shares that each shareholder purportedly purchased ranged from 2,947 shares for $147.37 to 7,895 for $315.79, approximately $0.04 per share. (Ex. 6 (chart of South African investors); Ex. 8 (email from Founder A to Transfer Agent A, Sept. 26, 2013 (attaching spreadsheet of investors containing "shareholder details")).)

12. The majority of the South African investors purportedly paid for their shares using payment methods that could not be traced to their names. According to records given to FINRA in connection with a Form 211 application (discussed below), payments from 20 investors were evidenced by only a deposit slip or a deposit receipt for ABSA bank, listing the SA Secretary's name, reflecting that the deposits were made in cash. (Ex. 7b (deposit slips); Ex. 7c (deposit receipts).) All deposits were made on August 27, 28, or 30, 2013. (*Id.*) Payments from 14 other investors were evidenced by cashiers' checks with sequential numbers from ABSA bank (check numbers 20254 through 20265, and 20267 through 20268), all dated August 24, 2013, indicating they were all purchased at the same time (Ex. 7a (cashiers' checks).)

13. On April 19, 2017, I and other staff spoke with two of the supposed South African investors ("SA Investor 1" and "SA Investor 2"), one of whom was purported to have sold to Lin. SA Investor 1 stated that the SA Secretary, a high school friend, had approached him at work and had asked him to sign paperwork for an investment in EPCC. The SA Secretary told SA Investor 1 that money would be paid for the supposed investment and that SA Investor 1 was not required to make any payment himself; SA Investor 1 never personally paid anything. The SA Secretary asked SA Investor 1 to sign a document (that SA Investor 1 claims not to have read), and SA Investor 1 never heard about it again. SA Investor 1 never received any shares, sold any shares, or received proceeds from the sale of any shares of EPCC. When the staff asked

if the address on the stock agreement was SA Investor 1's correct address, he said that he thought the address must be the SA Secretary's because it was not his. SA Investor 2, who purportedly sold to Lin, stated she was not aware that she had ever invested in a company called EPCC or any charcoal company. When the staff asked if she knew the SA Secretary, she said she did but that he never asked her to invest in a company or sign papers. She then said she was busy at work but to call her back; the staff has since been unable to reach her.

14. On September 26, 2013, Founder A, sent EPCC's transfer agent, Transfer Agent A, a spreadsheet containing "shareholder details" for EPCC's investors. (Ex. 8 (email from Founder A to Transfer Agent A, Sept. 26, 2013).) The spreadsheet listed Founder A as president and owner of 5 million shares, and included the 38 South African investors of EPCC.

15. On September 30, 2013, Founder A asked Transfer Agent A for a "status up date [sic] as to when the certified shareholder list and share certificates will be ready. So that I can give you the address to ship shareholder certificates to. Do not ship any out before you correspond with me." (Ex. 9 (email from Founder A to Transfer Agent A, Sept. 30, 2013).) On October 3, 2013, Founder A directed Transfer Agent A to send "all Share certificates to" the SA Secretary in South Africa. (Ex. 10 (email chain between Founder A and Transfer Agent A, Oct. 3, 2013).) The shares purportedly issued under the Form S-1 were issued in the names of the 38 shareholders on October 4, 2013 (Ex. 12( Transfer Agent A records for the Oct. 4, 2013 transfer)), and Transfer Agent A mailed the certificates on October 7, 2013, along with the certificate of apparent Canadian-resident Founder A, to the SA Secretary. (Ex. 13 (email from Transfer Agent A to Founder A, Oct. 7, 2013 (forwarding FedEx shipment notification).) On October 11, 2013, Founder A informed Transfer Agent A, "Thank you we have received all 39 share certificates." (Ex. 14 (email from Founder A to Transfer Agent A, Oct. 11, 2013).)

16.     Also on September 30, 2013, the end of the first fiscal year after filing its S-1, EPCC ceased to be a reporting company pursuant to 15(d) of the Exchange Act (which it had been before as a result of its S-1 filing) because 15(d) reporting requirements would only continue if it had had 300 or more record holders. At no time since then has the number of record holders increased to 300 or more.

**C.     Attempts to List EPCC for Trading in U.S.**

17.     Two months later, in December 2013, a market maker, Market Maker A, filed a Form 211 with FINRA seeking approval to enter unpriced quotes of EPCC on OTC Bulletin Board and in OTC Link.  (Ex. 4 (EPCC Form 211) at F_000027-38.)  In the Form 211 Application, Market Maker A stated that EPCC's counsel had put it in touch with Founder A.

18.     A market maker must complete Form 211 in order to initiate quotations of a security in a quotation medium, including OTC Bulletin Board or OTC Link.

19.     On January 13, 2014, Market Maker A provided additional information at FINRA's request regarding EPCC, reporting that the SA Secretary had solicited all of the South African investors, and that "the Company's officers have no experience in the charcoal industry . . . ." (*Id.* at F_000043.)  FINRA approved this request on February 12, 2014.  (*Id.* at F_000050.)

20.     On February 4, 2014, EPCC's board (by Founder A as sole director) elected to redeem and retire 4,780,000 of Founder A's shares, leaving him with 220,000 restricted shares. (Ex. 15 (Transfer Agent A records for the Dec. 31, 2014 transfer).)

**D.     EPCC is Offered as a Shell Company for Sale**

21.     As early as September 2014, an individual who had no known ties to EPCC began to offer EPCC for sale, emailing another person: "Here are 2 shells you are looking for.  EPCC

delivers 100% but not DTC . . . ." (Ex. 16 (email from SC to NB, Sept. 22, 2014).)  Based on my training and experience, I understand the email sender to have been marketing EPCC as a shell company for which 100% of its shares could be delivered to a potential buyer.  Based on my training and experience, I understand the reference to DTC to indicate that the shares had not yet been confirmed by the Depository Trust Company as eligible for deposit.  A company with shares eligible for deposit with DTC makes it more marketable to purchase as a shell.

22.     On or before February 12, 2015, EPCC amended its articles of incorporation to "effect a 273:1 Forward Stock Split" and according to the corporate action EPCC's share amount went from 367,039 to 100,201,647.  (Ex. 17 (email chain between FINRA, Transfer Agent A, & Founder A, Jan. 20 to Feb. 12, 2015); Ex. 18 (certificate of amendment to articles of incorporation).)  According to records obtained from Transfer Agent A, the number of shares identified in the corporate action for the forward split was different than the number of shares outstanding.  There were 367,041 shares outstanding prior to the 273:1 forward split.

23.     Following this, on February 17, 2015, EPPC's counsel, Founder A, and Transfer Agent A began to discuss DTC eligibility for EPCC.  (Ex. 19 (email from EPCC's counsel to Founder A & Transfer Agent A, Feb. 17, 2015.)  Transfer Agent A provided information to the Depository Trust & Clearing Corporation on March 13, 2015, at which point it confirmed EPCC was "full-service eligible."  (Ex. 20 (email from Transfer Agent A to DTCC, Mar. 13, 2015); Ex. 21 (email from DTCC to Transfer Agent A, Mar. 13, 2015 (forwarded to Founder A)).)

### E.     Sales of All 38 South African Investors' Shares to Defendants and Eight Other Chinese Investors

24.     At least as early as February 2015, Attorney A edited draft share purchase and escrow agreements for the sale of Founder A's restricted EPCC shares to a company in Hong Kong ("Hong Kong Corp."), and for the purported sale of the 38 South African's EPCC shares to

the Chinese investors.  (Ex. 22 (email from **Attorney A to NB**, June 1, 2015 (attaching draft escrow and stock purchase agreements found at Exs. 23 and 35)).)

25.     All but one of the 38 South African investors purportedly signed "Irrevocable Stock Power" agreements, agreeing to "irrevocably constitute and appoint" Transfer Agent A to transfer the shares, and "Third Party Release" forms to transfer their shares.  (Ex. 24 (Transfer Agent A records for the May 18, 2015 transfer).)

26.     Irrevocable Stock Powers and Third Party Release forms are used to transfer ownership of shares, in lieu of signing the back of stock certificates.  These documents were left blank where the buyer of the shares was to be listed.  (*Id.*)

27.     These 37 investors purportedly signed these documents in front of the same notary in the town of Bloemfontein, South Africa.  (*Id.*)  At least 16 of these purported shareholders' addresses provided to Transfer Agent A were in Northern Cape, South Africa. (Ex. 8 (email from Founder A to Transfer Agent A, Sept. 26, 2013 (attaching spreadsheet of investors).)  According to Google Maps, Northern Cape, South Africa is more than 250 miles from Bloemfontein, South Africa.

28.     SA Investor 1 only recalled signing one document and said he did not sign any document before a notary.

29.     As to the remaining South African investor, Attorney A had previously arranged, on or around April 7, 2015, for the sale of her 905,211 (post-split) shares of EPCC to a company in Gainesville, Florida.  (Ex. 25 (Transfer Agent A records for the Apr. 29, 2015 transfer); Ex. 11 (Immage Transfer Journal).)  This company deposited those shares with Market Maker A, on or about April 29, 2015, which put the shares in "street name" on May 6, 2015.  (Ex. 26 (Transfer Agent A records for the May 6, 2015 Transfer).)

30.    These same shares were pulled out of street name on or around October 21, 2015, and on or around November 20, 2015, purportedly sold to one of the ten Chinese investors. (Ex. 27 (Transfer Agent A records for the Oct. 21, 2015 transfer); Ex. 28 (Transfer Agent A records for the Nov. 20, 2015 Transfer).)  Evidence suggests this Chinese investor had paid for these shares in March 2015, when $14,750.07 was wired to Attorney A's trust account. (Ex. 29 (Attorney A's attorney-trust-account bank records (excerpted) for Mar. 19 to Mar. 26, 2015) at 2.)  The Chinese investor initially only received 3,042,312 shares, which would make his per share price approximately $0.0048. (Ex 62 (chart of Chinese investors' purchases); Ex. 24 (Transfer Agent A records for the May 18, 2015 transfer) at 7.)  However, after receiving the additional 905,211 shares around November 2015, the Chinese investor's per share price dropped to $0.0037 (equivalent to the other Chinese investors).

31.    From March 19 to March 26, 2015, Attorney A's attorney-trust account received incoming wires from the ten Chinese investors, ranging from $13,906.42 to $16,912.74, all wired from banks in China. (Ex. 62 (chart of Chinese investors' purchases); Ex. 29 (Attorney A's attorney-trust-account bank records).)  Those investors were sold a total of 40,142,136 shares (when including the 905,211 shares that initially went to the Florida company) at approximately $0.0037 per share. (*Id.*; Ex. 24 (Transfer Agent A records for the May 18, 2015 transfer); Ex. 28 (Transfer Agent A records for the Nov. 20, 2015 Transfer).)

32.    The staff has been unable to uncover any evidence indicating the South African investors received the proceeds from their purported sales. First, SA Investor 1 told the staff that he had never received the proceeds (and, indeed, never paid any proceeds or owned any shares). SA Investor 2 also claims to have never owned any shares of EPCC stock. Second, the records for Attorney A's trust account do not show any payments from this account to the South African

investors and do not show debits matching the amounts that the Chinese investors purportedly paid for the share purchases. (Ex. 29 (Attorney A's attorney-trust-account bank records).)

33.     Lin and Chen purchased their shares under separate stock purchase agreements dated March 31, 2015. Lin purchased 4,526,067 shares—including purportedly from SA Investor 2 who, as noted above, did not recall investing in EPCC—for $16,912.74, for a price per share of $0.003737. (Ex. 30 (Broker A deposit documentation for Lin, enclosing the stock purchase agreements) at SEC-####-E-0012591-99.) Lin signed his stock purchase agreement on March 20, 2015, and the sellers purportedly signed from March 3 to March 19, 2015. (*Id.*) Chen purchased 3,897,621 shares for $14,564.40, for a price per share of $0.003737. (Ex. 31 (Broker B deposit documentation for Chen, enclosing the stock purchase agreements) at SEC-####-E-0000476-83.) Attorney A's law firm acted as escrow agent for both sales. Lin stated in his deposit documentation that the purpose of the deposit was for "resale." (Ex. 30 (Broker A deposit documentation for Lin, enclosing the deposit securities request) at SEC-####-E-0012572-75.) In his securities deposit request, Lin cited the "S-1 registration, August 1, 2013." (*Id.*)

34.     I reviewed EDGAR and determined there were no registration statements filed or in effect with respect to the purported sale of the securities from the purported South African investors to the Chinese Investors.

35.     Identifications like passports are often required for foreign nationals to open U.S. brokerage accounts. Lin's Chinese passport was issued on March 17, 2015, and Chen's Chinese passport was issued on March 24, 2015—only days before they signed the stock purchase agreements. (Ex. 32 (copy of Chen's Passport); Ex. 33 (copy of Lin's Passport).) These

passports would not have been necessary to purchase the EPCC shares; they may have been useful, however, as identification to open a U.S. brokerage account and deposit shares.

36.     On April 1, 2015, Founder A signed an agreement to sell his restricted shares of EPCC to Hong Kong Corp. for $180,000. (Ex. 34 (stock purchase agreement between Founder A to Hong Kong Corp., dated Apr. 1, 2015).) Attorney A's firm served as the escrow agent for this transfer. (*Id.*) At least one draft escrow agreement, dated February 26, 2015 but unexecuted, stated Hong Kong Corp. was the "representative of certain investors" acquiring 100,202,466 shares of EPCC. A second unexecuted draft stock purchase agreement for one of the Chinese investors, dated March 2015, but also unexecuted, stated that Hong Kong Corp. was "serving as a representative of the purchaser." (Ex. 22 (email from Attorney A to NB, June 1, 2015 (attaching draft escrow and stock purchase agreements found at Exs. 23 and 35)).

### F.     Creation of IMMG and Reverse Merger into EPCC

37.     According to executives at Company A, sometime in early 2015, an individual, Person A, who claimed to be with Hong Kong Corp., contacted executives at Company A, which the staff understands to have been a biotechnology "start-up" seeking outside investment. Person A proposed the creation of IMMG, which would license certain Company A technology relating to cancer immunotherapy purportedly with the aim of developing and commercializing therapy. Person A proposed that Person B, whom he described as a colleague and entrepreneur who could help fundraise, be appointed CEO of IMMG. The principals of Company A agreed, but to date they have never met Person A or Person B in person.

38.     On April 7, 2015, Founder A resigned as EPCC's President, Secretary (though SA Secretary claimed recently to have been (or perhaps even still be) the EPCC Secretary), and Treasurer, appointed Person B as President, Secretary, Treasurer, and member of the board of

directors, and then immediately resigned from the board. On April 17, 2015, Person B, as sole member of the board, appointed Attorney A as Corporate Secretary and authorized a new bank account for EPCC for which Attorney A was to be the sole signer. (Ex. 36 (email from Attorney A's law firm to Transfer Agent A, Apr. 21, 2015 (attaching Founder A's letter of resignation and board member resolutions, found at Exs. 37, 38, and 38a).)

39.     On or about May 11, 2015, Attorney A sent a single set of instructions to Transfer Agent A advising it to transfer the 60,058,909 restricted shares to Hong Kong Corp., and all 39,236,925 shares purportedly held by 37 of the South African investors to the ten Chinese investors. Paperwork for the sale was completed in March 2015, and the restricted shares were sold in early April 2015. (Ex. 24 (Transfer Agent A records for the May 18, 2015 transfer); *see also* Ex. 39 (Transfer Agent A records for the July 30, 2015 transfer (correcting certain shares certifications that had been incorrectly issued).) But there was then a delay in transferring the restricted shares—and the purportedly unrestricted S-1 shares—when it came to light that the restricted certificate had been cancelled and the correct certificate was never reissued to Founder A. On May 7, 2015, Attorney A emailed Transfer Agent A stating, "We have a deal that we tried to close yesterday but need to resolve this first. . . . I've got many anxious people waiting for me to close this deal." (Ex. 40 (email chain between Attorney A and Transfer Agent A, May 6 to May 7, 2015).) I am not aware of any reason why the sale of the shares to the Chinese investors should have been delayed pending resolution of the sale of the block of securities to Hong Kong Corp. except that the Chinese investors and Hong Kong Corp. were acting in concert to obtain control of IMMG.

40. On May 12, 2015, EPCC, at Person B's purported direction, changed its name to Immage Biotherapeutics Corp. and its ticker symbol to IMMG. (Ex. 41 (email chain between Attorney A's law firm and Transfer Agent A, May 21, 2015).)

41. On May 18, 2015, the original EPCC shares of 37 of the South African investors were cancelled and issued in the name of the ten Chinese investors. (Ex. 24 (Transfer Agent A records for the May 18, 2015 transfer).) On the same date, in the same transaction, the restricted share certificate of EPCC was also cancelled and issued to Hong Kong Corp. (*Id.*) Attorney A's firm paid Transfer Agent A for the transfer fees. (Ex. 43 (email chain between Attorney A's firm and Transfer Agent A, Apr. 8, 2015).)

42. On May 21, 2015, EPCC filed an Article of Merger with the Nevada Secretary of State, "whereby it entered into a merger with its wholly-owned subsidiary [IMMG]." (Ex. 42 (Form 10-K for the Fiscal Year ended Aug. 31, 2016) at 4.) IMMG was described as "a biotechnology company developing cancer immunotherapy through the rapid and efficient development of cutting edge immunotherapy candidates using bioinformatics and outsourced laboratory resources." (Ex. 44 (Form 8-K, filed July 29, 2015) at 3.) IMMG listed its address as that of Attorney A's law firm in reporting the name change to FINRA. (Ex. 46 (name change application to FINRA).)

43. On June 4, 2015, IMMG and Company A entered into an Asset Purchase Agreement, in which IMMG purchased 51% of the patent rights for technology Company A owned, and which gave Company A shares equivalent to 30% of the IMMG's outstanding stock upon Company A filing for a provisional patent application. (Ex. 97 (asset purchase agreement between IMMG and Company A, dated June 4, 2015, filed as an attachment to Ex. 44 (Form 8-K, filed July 29, 2015); Ex. 49 (share issuance to Company A).) The following day certain

Company A principals were appointed as members of the IMMG's Board of Directors and as the Chief Executive Officer and the Chief Science Officer. (Ex. 44 (Form 8-K, filed July 29, 2015) at 46.)

44.    After EPCC changed its name to IMMG, Attorney A sent to Transfer Agent A on June 29, 2015, the shares certificates for the ten Chinese investors and for Coventry, asking the transfer agent to reissue the EPCC shares in the new company, IMMG's, name. Attorney A wrote to Transfer Agent A, "These shares have never been delivered to the shareholders. Please have the certificates delivered back to our office via overnight delivery." (Ex. 98 (Transfer Agent A records for the July 8, 2015 transfer).)

45.    On July 29, 2015, IMMG filed a Form 8-K with the Commission stating that it had, as of the merger, "ceas[ed] to be a 'shell company' as that term is defined in Rule 405 promulgated by the Securities and Exchange Commission under the Securities Act of 1933." (Ex. 44 (Form 8-K, filed July 29, 2015) at 2.)

46.    On July 29, 2015, Attorney A's paralegal emailed Transfer Agent A to advise them that three investors, one of whom was Lin, did not receive the proper number of shares. Attorney A's paralegal advised Transfer Agent A, "I don't think that cancelling any of these shares will put anyone in affiliate status that shouldn't be." (Ex. 48 (email chain between Attorney A's law firm and Transfer Agent A, July 29, 2015).)

47.    On August 17, 2015, Person B sent a letter to Transfer Agent A instructing it to issue 42,943,521 shares of restricted common stock to Company A, giving Company A a minority interest in IMMG. (Ex. 49 (share issuance to Company A).).

## G. Chinese Investors Deposit IMMG Shares in U.S. Brokerage Accounts

48.    Lin and Chen subsequently deposited their shares of IMMG at U.S. brokerage firms Broker A and Broker B, respectively. On July 24, 2015, Lin signed a "Client Checklist for Deposit Documentation" with Broker A.[2] (Ex. 30 (Broker A deposit documentation for Lin) at SEC-####- 0012575.)

49.    Attorney A sent a registered representative at Broker A a letter dated August 4, 2015, stating he had acted "as the escrow agent on behalf of the Sellers" in connection with Lin's purchase of the shares. (*Id.* at SEC-####-0012601.) On August 20, 2015, Lin signed a representation for Broker A claiming he had never been an "Affiliate" of IMMG, that is, he does not control, is not controlled by, or is not under control with IMMG. (*Id.* at SEC-####-0012587-88.) Broker A accepted Lin's deposit of IMMG shares on or around August 20, 2015. (*Id.*)

50.    Chen's deposit process took longer. On or around August 27, 2015, Attorney A sent Transfer Agent A a letter, enclosing the stock certificates for Chen and for another shareholder, Chinese Investor 2. Attorney A informed the company that it needed to correct a misspelling in Chen's name. Attorney A asked Transfer Agent A to send the corrected certificate along with Chinese Investor 2's certificate to Chen's name at an address in China. (Ex. 50 (Transfer Agent A records for the Aug. 31, 2015 transfer).)[3]

---

[2] In Lin's account opening documents, he stated that one of the other ten Chinese investors, Chinese Investor 1, referred him to Broker A; thus these two investors knew each other. (Ex. 95 (Lin's account opening documents at Broker A).) Despite recommending Broker A to Lin, Chinese Investor 1 deposited his stock at another broker. (Ex. 51 (Transfer Agent A records for the May 6, 2016 transfer).)

[3] It is not clear why Attorney A also sent Chinese Investor 2's certificate to the transfer agent, but the fact that both Chen and Chinese Investor 2's certificates were sent to Chen indicates Chen and Chinese Investor 2 knew each other.

51. Shortly after, on or around September 1, 2015, Chen sought to deposit her shares with Broker B. (Ex. 31 (Broker B deposit documentation for Chen) at SEC-####-E-0000472.) Attorney A sent a letter dated August 31, 2015 to a registered representative at Broker C—the introducing broker-dealer clearing through Broker B—stating he was "of the opinion that the stock transactions by which the Stock was issued to [Chen] was validly registered pursuant to the Securities Act of 1933." (*Id.* at SEC-####-E-0000474-75.) Specifically, Attorney A stated: "The Holder acquired the Stock from four (4) previous holders . . . , each of whom purchased the Stock directly from the Issuer on or about August 24, 2013, pursuant to an effective Registration Statement filed by the Issuer on Form S-1/A, file number 333-185368, effective date August 1, 2013. Neither the Holder or [sic] the previous holders are or have been affiliates of the Issuer within the last ninety (90) days."[4] He concluded, based on these facts, and that "the Holder resides in China," that, "I am of the opinion that the Holder is able to freely sell the Stock." (*Id.*) On September 14, 2015, Chen's deposit of 3,897,621 shares was approved by Broker B. (*Id.* at SEC-####-E-0000468.)

52. Lin sent $1,038 to Broker A to open the account; $925 of which was used to pay for the fees to deposit his IMMG stock. Chen sent $1,000 to Broker B to open her account; $985 of which was used to pay for the fees to deposit her IMMG stock. The only other assets deposited into Lin's and Chen's accounts were shares of IMMG and the only trading that has occurred in those accounts is sales of IMMG securities. Thus, all remaining monies currently in those accounts represent proceeds from their trading in IMMG securities. (Ex. 99 (Broker A

---

[4] The effective date of the S-1 registration statement was actually July 31, 2013; Lawyer A appears to have made an error.

account activity log for Lin (excerpted)); Ex. 100 (Broker B account activity log for Chen (excerpted)).)

53.     In 2016, five other investors also deposited their IMMG shares with brokers located outside of the United States. (Exs. 51-55 (Transfer Agent A records for May 6, 2016, Aug. 11, 2016, Sept. 15, 2016, Sept. 30, 2016, and Oct. 20, 2016 transfers).) Attorney A's credit card was authorized to be charged for the deposit fees for four of these deposits. (*Id.*)

54.     Person A also inquired whether another U.S.-based broker-dealer, Broker D, would accept for deposit IMMG stock as well. Though Person A is not listed as a shareholder of the company, and is not listed in any IMMG's filings, he indicated he had an interest in the company in his communications with Broker D. Person A asked Broker D in October 2015 to "take a look at IMMG and let me know if that is something you are able to clear." (Ex. 56 (email chain between Person A and Broker D, Oct. 19, 2015).) The registered representative informed Person A, "we will need to take a look more carefully at the clearance package. Yes, [the clearing firm] will be able to take it on, but [Broker D] Compliance will need to see the nature of this transaction before we make decision." (*Id.*) It does not appear, however, that any IMMG shares from Chinese investors were deposited at Broker D.

**H.     Trading In IMMG and Promotional Campaign**

55.     IMMG appears to have first traded on September 14, 2015. (Ex. 68 (Bloomberg chart).) Over the following year, IMMG traded on only 20 days, from prices ranging from $0.15 to $0.42, and average volume on days traded of only 2,617 shares. (*Id.*) Beginning in late January 2017, the trading volume for, and price of, IMMG's shares rose on trading that does not coincide with any public news or corporate announcement. (*Id.*)

56.     IMMG issued press releases on September 13, 2016, November 28, 2016, January 6, 2017 and February 16, 2017. (Exs. 89-93 (IMMG press releases).) No IMMG shares traded on any of these days except January 6, 2017, when 300 shares traded. (Ex. 68 (Bloomberg chart).)

57.     Beginning on January 30, 2017, however, although no public news or filing by IMMG was issued, trading volume and IMMG's share price both increased markedly. (*Id.*) Both Lin and Chen increased their sales beginning on January 30, 2017. (Ex. 58 (summary of Lin trading); Ex. 59 (summary of Chen trading).)

58.     Beginning on March 28, 2017, until the trading was suspended on April 4, 2017, there appears to have been a concerted promotional campaign tied to a press release issued by IMMG after market close March 27, 2017. (Exs. 71-88 (promotional emails dated March 25 to April 4, 2017).) Volume increased dramatically and the price increased to as high as $1.62 as at least three promotional web-sites sent emails touting IMMG. (Ex. 68 (Bloomberg chart); Ex. 94 (Price and Volume Chart).)

59.     On March 25, 2017, a penny stock promotional website, Stock Promotion Website A, referred email subscribers to an upcoming stock tip. (Ex. 71.) On March 27, 2017, Stock Promotion Website A sent another email stating, in part, "IMPORTANT ALERT: MY STOCK TIP OF THE YEAR IS COMING UP TOMORROW. READ NOW!" (Ex. 72.) This email further stated, "I'm about to send you my special report tomorrow morning at some time between 9 AM and 10 AM EST." (*Id.*)

60.     On March 27, 2017, IMMG issued a press release stating, in part, that its immunotherapy had "successfully passed early toxicology and efficacy studies" in mice and that the results would help the company "move forward with [their] conversations with the FDA."

(Ex. 93 (IMMG press release, Mar. 27, 2017).) On this day, 64,600 IMMG shares traded. (Ex. 68 (Bloomberg chart).) IMMG's prior, January 6, 2017, press release made clear that no applications with the FDA were pending, and that IMMG had only "plans to file for the FDA's IND program for approval into Phase 1 human trials in mid-2018." Ex. 91 (IMMG press release, Jan. 6, 2017).)

61.     On March 28, 2017, Stock Promotion Website A sent an email stating, in part, "This biotech [IMMG] may be on the cusp of getting FDA approval for its cancer therapies." (Ex. 73.) Stock Promotion Website A sent at least two additional emails similarly touting IMMG that same day and on March 29 and 30, at least one email on March 31 and two more emails on April 3 for a total of ten emails. (Exs. 73-82.)

62.     On March 28, 2017, Stock Promotion Website B sent an email stating, in part, "IMMG seems to be on the verge on [sic] curing cancer according to its latest press release." (Ex. 83.) Stock Promotion Website B sent at least one additional email similarly touting IMMG on March 29 and April 4, 2017. (Exs. 84-85.)

63.     On March 28, 2017, Stock Promotion Website C sent an email stating, in part, "This biotech may be on the cusp of getting FDA approval for its cancer therapies." (Ex. 86.) Stock Promotion Website C sent another email touting IMMG that same day (Ex. 87), and another on or before April 3, 2017. (Ex. 88 (copy of the April 3, 2017 email posted on a message board).)

64.     In total, between March 28 and April 4, 2017, at least three promotional sites touted IMMG with at least 16 promotional emails.

65.     Between March 28 and April 3, 2017, IMMG's average daily volume was 1,771,165, with a low of $0.40 and a high of $1.62. (Ex. 68 (Bloomberg chart).) During this

period of promotional emails -- from March 28, 2017 through April 3, 2017 -- Lin sold

approximately 1.28 million shares for net profits of approximately $1.11 million dollars, and

Chen sold approximately 660,000 shares for net profits of approximately $486,000. (Ex. 58

(summary of Lin trading); Ex. 59 (summary of Chen trading).)

66.     On April 3, 2017, IMMG issued a press release that stated, in part, "On March

31st, 2017, OTC Markets informed the Company that it became aware of certain promotional

activities concerning ImMAGE Biotherapeutics and its common stock." (Ex. 69 (IMMG press

release, Apr. 3, 2017).) The release further quoted from IMMG's COO stating, "The Company

has not engaged any third parties to provide marketing services. Recent press releases have

reported on and provided disclosure of legitimate and ongoing corporate activity only, and are

not part of any promotional activities or campaign." (*Id.*)

67.     On April 4, 2017, the Commission suspended trading in IMMG stock for ten days

"because of concerns regarding the accuracy and adequacy of information in the market place

and potentially manipulative transactions in IMMG's common stock." (Ex. 67 (Order of

Suspension of Trading, *In the Matter of Immage Biotherapeutics Corp.*, File No. 500-1 (Apr. 4,

2017).)

### I.     Lin's Trading

68.     After depositing his 4,526,067 IMMG shares in August 2015, Lin made low-

volume trades in 2015 and 2016. (Ex. 58 (summary of Lin trading).) Lin traded on four days in

2015 and seven days in 2016, selling less than 20,000 shares total and at most 4,440 shares at a

time. (*Id.*) Daily average prices for Lin's sales during this time ranged from $0.165 to $0.42.

Beginning in late January 2017, Lin began selling more shares. (*Id.*) On February 9, 2017, just

two business days after his funds became available from his recent sales, Lin wired $65,000

funds out of his account to a bank in Hong Kong. (Ex. 60 (wire request form for Lin, Feb 9, 2017).)

69.    From January 31, 2017 to March 21, 2017, Lin sold IMMG shares on ten days, with an average 18,774 shares per day, at daily average prices ranging from $0.2543 to $0.7755 per share. (Ex. 58 (summary of Lin trading).)

70.    From March 28, 2017, through April 3, 2017, Lin sold a total of 1,279,734 shares in five days, at daily price averages ranging from approximately $0.65 to $1.47 per share. (*Id.*) On March 28 (the first day of the promotional campaign), Lin sold 664,000 shares for net proceeds of $416,080. (*Id.*) On April 3, 2017, the first day the proceeds from the March 28 selling became available, Lin wired $458,000 to the bank in Hong Kong. (Ex. 61 (wire request form for Lin, Apr. 3, 2017).)

71.    In total, Lin sold 1,486,734 shares for $1,226,205.48 (net of fees), with a cost basis of $5,555.92. (Ex. 58 (summary chart of Lin trading).) Thus, his profit on these shares was $1,220,649.56, for a profit of approximately $0.82 per share. (*Id.*)[5]

72.    On April 4, 2017, around 8:52 am, prior to the suspension order taking effect, Lin emailed Broker A to place 11 additional sell orders at prices ranging from $1.26 to $1.36. These orders were not executed (Ex. 57 (email chain between Lin and Broker A, Apr. 3 to Apr. 4, 2017).).

---

[5] Lin intended to sell much more. On April 3 he traded 277,000 shares at an average price of $1.4745, but at 1:35 p.m. he placed sell orders for up to 120,000 shares at 12,000 shares increments at prices from $1.63 to $1.72. (Ex. 57 (email chain between Lin and Broker A, April 3, 2017 to April 4, 2017).) About an hour later, he increased these unexecuted orders to 20,000 share increments, raising the total additional shares he would have sold to 200,000 shares (had the price kept rising). (*Id.*) Before the market opened on April 4, Lin sent his broker sell orders at progressively rising prices from $1.26 to $1.36 starting at 5,000 units and increasing to 8,000 units. (*Id.*) These 73,000 share hoped-for sales could not occur because the trading was suspended.

73.     The day after the suspension, on April 5, 2017, Lin requested that Broker A wire out the $311,000 of cash that had cleared in his account that day to his Hong Kong bank account. (Ex. 63 (wire request form for Lin, April 3, 2017); Ex. 64 (email chain between Lin and Broker A, April 5, 2017 to April 6, 2017).)  The next day, April 6, when approximately $400,000 more became available, Lin asked if he should change the wire to reflect all the cash available.  (Ex. 64 (email chain between Lin and Broker A, April 5, 2017 to Apr 6, 2017).)  However, Broker A did not process the wire transfer requests.  As of April 24, 2017, Lin currently has $703,218 in proceeds from the sales of his IMMG shares and 3,039,333 remaining IMMG shares deposited with Broker A.  The wires that Lin attempted to initiate on April 5 and April 6 represent the proceeds from Lin's sales of IMMG.

74.     I reviewed EDGAR and there were no registration statements filed or in effect with respect to the sales by Lin to the public.

75.     The securities sold by Lin were sold through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.

**J.     Chen's Trading**

76.     After depositing her 3,897,621 IMMG shares in September 2015, Chen traded in 2015 and 2016.  Chen sold IMMG shares on two days in 2015, November 12 and 18, when she sold a total of 5,000 shares for $0.25 per share.  (Ex. 59 (summary of Chen trading).)  She did not sell any IMMG shares again until January 30, 2017.  From January 30, 2017 to March 1, 2017, Chen sold 218,000 shares over 12 days (at an average of 18,167 shares per day) at an average price of approximately $0.47 per share.  (*Id.*)  On or around March 6, 2017, Chen wired $97,000 from her brokerage account to the same Hong Kong bank to which Lin transferred his

proceeds. (Ex. 65 (wire request form for Chen, Mar. 6, 2017).) From March 28 to March 31, 2017, she sold a total of 664,300 IMMG shares at daily average prices ranging from $0.61 to $1.1286. (Ex. 59 (summary of Chen trading).) On March 31, 2017, Chen requested to wire $325,000 from her account to the Hong Kong bank, but Broker B was unable to meet her request because it was having problems at that time processing international wire transfers. (Ex. 66 (wire request form for Chen, Mar. 31, 2017).) When the Commission suspended trading of IMMG, the introducing broker-dealer put a hold on activity in Chen's account.

77. Based on my review of trading records, Chen sold IMMG shares to a broker-dealer located in Manhattan, New York on, for example, February 8, 2017.

78. In total, Chen sold 887,300 shares for $586,044.63 (net of fees), with a cost basis of $3,315.84, for a profit of $582,728.79 and an approximate $0.65 profit per share. (Ex. 59 (summary of Chen trading).) As of April 21, 2017, Chen has $488,502.46 in proceeds from the sales of her IMMG shares and 3,010,321 remaining IMMG shares deposited with Broker B. (*Id.*)

79. Based on my review or records from Broker B, on April 3, 2017 Chen placed an order to sell an additional 100,000 shares of IMMG which was unexecuted.

80. On April 19, 2017, after the 10 day trading suspension had elapsed, Broker C emailed Chen and statement, "To reiterate our conversation, we do not trade stocks in the GREY MARKET. Until the stock is lifted up in the OTC Markets as PINK or above, we will not be able to trade the shares for you." (Ex. 70 (Email from Broker C to Chen, April 19, 2017).)

81. I reviewed EDGAR and there were no registration statements filed or in effect with respect to the sales by Chen to the public.

82. The securities sold by Chen were sold through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: April 26, 2017

_____
Joseph Darragh