UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 17 Civ. 3054 (VEC) |
| Plaintiff, | **ECF CASE** |
| - against - | |
| WENSHENG LIN and SHENG LI CHEN, | |
| Defendants. | |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS WENSHENG LIN AND SHENG LI CHEN**

Kevin P. McGrath
Jennifer K. Vakiener
Hane L. Kim
Steven G. Rawlings
Attorneys for Plaintiff
Securities and Exchange Commission
New York Regional Office
200 Vesey Street
New York, N.Y. 10281
(212) 336-0533 (McGrath)

July 11, 2017

# Table of Contents

Page

PRELIMINARY STATEMENT ...................................................................................1

PROCEDURAL BACKGROUND...............................................................................2

THE COMPLAINT .....................................................................................................4

    Issuance of IMMG Securities .........................................................................4

    Acquisition of IMMG Securities By Defendants............................................4

    Lin's Unregistered Sales of IMMG Securities................................................5

    Chen's Unregistered Sales of IMMG Securities.............................................6

    Transfers of Illegal Proceeds From Sales Out of the U.S. .............................7

    Defendants' Illegal Sales Coincided with A Pump-and-Dump Scheme ...........8

ARGUMENT ...............................................................................................................10

  I.  Default Judgment Standard.................................................................................10

  II.  The Complaint Establishes Defendants' Liability
     With Respect to Section 5 of the Securities Act.......................................11

  III. The Court Should Order the Requested Relief ................................................13

    A.  Defendants Should Be Permanently Enjoined From Violating Section 5 .................13

    B.  Defendants Should Be Ordered to Disgorge, with Prejudgment Interest,
       Their Ill-Gotten Gains.............................................................................16

    C.  The Court Should Impose Civil Monetary Penalties ..................................18

    D.  The Court Should Impose a Permanent Penny Stock Bar on Defendants ..................21

CONCLUSION............................................................................................................22

## Table of Authorities

**Cases**                                                                                          Page

*Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504 (2d Cir. 1991) .............................................10

*AMTO, LLC v. Bedford Asset Management, LLC*, No. 14 Civ. 9913 (KMK),
   2015 WL 3457452 (S.D.N.Y. May 29, 2015) ...........................................................................3

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981) .............................................10, 11

*Bermudez v. Reid*, 733 F.2d 18 (2d Cir. 1984) ................................................................................10

*Cement & Concrete Workers Dist. Council Welfare Fund  v.
   Metro Found. Contractors, Inc.* 699 F.3d 230 (2d Cir. 2012) ................................................10

*Cotton v. Slone*, 4 F.3d 176 (2d. Cir 1993) .....................................................................................11

*Flanagan v. North Star Concrete Construction, Inc.*, No. 13 Civ. 2300(JS)(AKT),
   2014 WL 4954615 (E.D.N.Y. Oct. 2, 2014).............................................................................11

*Fustok v. ContiCommodity Services.*, Inc., 873 F.2d 38 (2d Cir. 1989) .......................................10

*In re Gordon Brent Pierce*, Exchange Act Rel. No. 71664,
   2014 WL 896757 (Mar. 7, 2014) .............................................................................................12

*In re Reserve Fund Sec. and Derivative Lig'n,* Nos. 09 MD 2011 (PGG);
   09 Civ. 4346 (PGG); 2013 WL 5432334 (S.D.N.Y. Sept. 30, 2013) ......................................19

*Prof'l Investig'g & Consult'g Agency Inc. v. Suzuki*, No. 11 Civ. 1025 (EAPD),
   2014 WL 48260 (E.D. Oh. Jan. 7, 2014) ...................................................................................4

*SEC v. Anticevic*, No. 05 Civ. 6991, 2010 WL 3239421 (S.D.N.Y. Aug. 16, 2010) ...................14

*SEC v. Baldassare*, No. 11 Civ. 5970 (ARR)(VVP),
   2014 WL 2465622 (E.D.N.Y. May 29, 2014) ..........................................................................10

*SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ........................13

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y.),
   *aff'd*, 155 F.3d 129 (2d Cir. 1998) ..........................................................................................11

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ........................................................................12, 13

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) .............................................................................12

**<u>Cases</u>**                                                                                      Page

*SEC v. ConnectAJet.com, Inc.*, No. 09 Civ. 1742-B,
2011 WL 5509896 (N.D. Tex. Nov. 9, 2011)....................................................................16

*SEC v. Czarnik*, No. 10 Civ. 45, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010)..........................12

*SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90 (2d Cir. 1978) ....................14, 17

*SEC v. E. Delta Res. Corp.*, No. 10 Civ. 310 (SJF), 2012 WL 3903478
    (E.D.N.Y. Aug. 31, 2012)............................................................................................19

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir.1996)..........................................14, 17

*SEC v. GTF Enterprises, Inc.*, 10 Civ. 4258, 2015 WL 728159 (S.D.N.Y. Feb. 19, 2015)..........19

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005)....................................................................................19

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975).............................................16

*SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013)........................12

*SEC v. Moran*, 944 F. Supp. 286 (S.D.N.Y. 1996)........................................................................17

*SEC v. Opulentica*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007)...........................................................20

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)........................................................................12

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013)......................................................................17, 20

*SEC v. Syndicated Food Services International, Inc.*, No. 04 Civ. 1303 (NGG)(ALC),
2010 WL 4668777 (E.D.N.Y. Nov. 9, 2010)....................................................................10

*SEC v. Tavella*, 77 F. Supp. 3d 353 (S.D.N.Y. 2015)....................................................................14

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ...............................12, 21

*SEC v. Universal Major Industries*, 546 F.2d 1044 (2d Cir. 1976)............................................12

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ..........................................................12

*SEC v. Verdiramo*, No. 10 Civ. 1888 (RMB)(AJP), 2013 WL 399230
    (S.D.N.Y. Feb. 1, 2013) ..............................................................................................19

**Statutes**                                                                            Page

*Securities Act of 1933*
Section 5, 15 U.S.C. § 77e.....................................................................................*Passim*
Section 20, 15 U.S.C. § 77t.............................................................................13, 18, 21

*Securities Exchange Act of 1934*
Section 3(a)(51), 15 U.S.C. § 78c(a)(51)...................................................................21


**Regulations**

17 C.F.R. § 201, Subpart E......................................................................................18


**Rules**

Rule 504, 17 C.F.R. § 230.504 ...............................................................................17
Rule 3a51-1, 17 C.F.R. § 240.3a51-1 .....................................................................21
Federal Rules of Civil Procedure 12(a) ....................................................................3
Federal Rules of Civil Procedure 55(b) ...............................................................1, 10

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its motion, pursuant to Federal Rule of Civil Procedure 55(b)(2) ("FRCP 55(b)(2)"), for entry of a default judgment against Defendants Wensheng Lin ("Lin") and Sheng Li Chen ("Chen") (collectively, "Defendants"), based on their failure to answer or otherwise respond to the Commission's Complaint.

The Commission's Complaint alleges that Defendants Lin and Chen sold unregistered shares of the penny stock of Immage Biotherapeutics Corp. ("IMMG") into the public market in violation of Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"). IMMG is a biotechnology company reportedly engaged in cancer research. Lin and Chen acquired their shares for approximately $0.0037 per share and sold roughly a third of their shares for as much as $1.4745 and $1.1286 per share, for net profits of approximately $1,220,000 and $582,000, respectively. The majority of Defendants' profits were the result of their massive sell-off of IMMG securities just days after promotional websites began touting IMMG's stock through claims that, at a minimum, were materially misleading (the "pump-and-dump"), and before trading in IMMG was suspended by the Commission on April 4, 2017.

The Defendants reside in China. After the illegal sales, Defendants quickly moved their ill-gotten gains from the United States to the same bank in Hong Kong before their assets were frozen by this Court on April 26, 2017. In addition to the ill-gotten gains that Defendants were able to transfer, Defendants unsuccessfully attempted to wire hundreds of thousands of more dollars of their ill-gotten gains to Hong Kong before their accounts were frozen.

The Defendants failed to appear at the Order to Show Cause hearing held on May 10, 2017 and have failed to answer or otherwise respond to the Commission's Complaint. Accordingly, the

Commission seeks default judgments against them, imposing injunctions against future violations of Section 5; imposing a bar against future trading in penny stocks; ordering Lin to disgorge $1,220,649.56 in ill-gotten gains plus $3,449.54 in prejudgment interest; ordering Chen to disgorge $582,728.79 in ill-gotten gains plus $942.26 in prejudgment interest; and imposing civil monetary penalties against each Defendant.

## PROCEDURAL BACKGROUND

On April 26, 2017, the Commission filed its Complaint against Defendants.  (Docket # 1). On the same day, the Court granted the Commission's emergency motion for an order to show cause and temporary restraining order freezing certain of Defendants' assets and granted certain other requested relief, including authorizing the Commission to serve Defendants by email with the Summons and Complaint, the order to show cause and the moving papers regarding the Commission's emergency motion (Docket # 3 (the "OTSC")).  The Court ordered the Defendants to file any opposition papers by May 5, 2017 and scheduled the show cause hearing for 10:30 a.m. on May 10, 2017.  (*Id.* at 3-4).

On April 27, 2017, the Commission served copies of the OTSC, the Summons and Complaint and the Commission's moving papers regarding its emergency motion on Defendants at the respective email addresses approved by the Court.  (Docket # 9).

On May 3, 2017, Defendant Lin sent the Commission staff an email from the same address to which the staff had sent the OTSC, Summons, Complaint and moving papers.  Lin stated: "Thank you for the notification.  Despite my opposition to the lawsuit because I believe my conduct is fully justified, I simply do not have the resources to engage in a lengthy, protracted litigation on foreign soil.  Consequently, I am left with no choice but to default in this case, and

consent to a judgment against me." (Exhibit A to Declaration of Kevin P. McGrath dated July 10, 2017 ("McGrath Decl.")).

On May 2, 2017, Defendant Chen sent the Commission staff an email from the same address to which the staff had sent the OTSC, Summons, Complaint and moving papers. Chen stated: "I refer to your letters, lawsuit and subpoena. While I am certain that I did not contravene any laws of the United States, I am also cognizant of the fact that my finances are limited and it would be far too difficult and costly to engage in litigation that may last for years. I will therefore not be contesting these charges that you have filed against me, and have no choice but to default and accept a judgment against me." (McGrath Decl. Ex. B).

Defendants did not submit any papers in opposition to the Commission's emergency motion and did not appear at the order to show cause hearing on May 10, 2017. Accordingly, at that hearing, the Court entered an Order freezing certain of Defendants' assets. (Docket # 11).

Pursuant to FRCP Rule 12(a)(1), Defendants' time to answer or otherwise respond to the Complaint was May 18, 2017, twenty-one days after they were served with the Summons and Complaint on April 27, 2017. Defendants failed to file an answer or other responsive pleading on or before May 18, 2017 and the Clerk of the Court has entered a Certificate of Default against Lin and Chen. (Docket # 16).[1]

---

[1] To the extent that the Court's Order (Docket No. 3 at 4, ¶ II) directing service of the Summons and Complaint, along with the OTSC filings, on the Defendants by email did not constitute a determination that such service was sufficient for purposes of Federal Rule of Civil Procedure 4, the Commission requests that the Court now so hold, pursuant to FRCP Rule 4(f)(3), particularly given Defendants' acknowledgment of notice of this action and the OTSC by responding via the same email to which the Summons, Complaint and OTSC papers were sent. *AMTO, LLC v. Bedford Asset Management, LLC*, No. 14 Civ. 9913 (KMK), 2015 WL 3457452, at *7-10 (S.D.N.Y. May 29, 2015) (collecting authorities) (permitting email service on defendant residing in Russia where such service was "reasonably calculated, under all the circumstances, to apprise [defendant] of the pendency of the action and afford [him] an opportunity to present [his] objections" (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106,

## THE COMPLAINT

### Issuance of IMMG Securities

IMMG's corporate predecessor, Epicure Charcoal, Inc. ("EPCC"), was incorporated in Nevada on June 21, 2012.  EPCC claimed it was a "development-stage company that intends to sell our own brand of Charcoal products for BBQ and restaurant grilling purposes."  (Docket # 1; Compl. ¶ 14).  On December 10, 2012, EPCC filed a Form S-1 registration statement with the Commission seeking to register the sale of 4,500,000 shares of common stock at $0.04 per share.  Form S-1 is an initial registration form for the public offer and sale of securities by companies and is used when no other form is authorized or prescribed.  The EPCC Form S-1 registration went into effect on July 31, 2013, after three amendments.  (Compl. ¶ 15).

In and around August and September 2013, 38 individuals, all based in South Africa, purportedly entered into Subscription Agreements to purchase a total of 147,042 shares of EPCC from the company for a total of $5,911.03, or approximately $0.04 per share.  (Compl. ¶ 16).

### Acquisition of IMMG Securities By Defendants

On or about March 31, 2015, Lin purchased 4,526,067 shares of EPCC for $16,912.74, purportedly from certain South African individuals, for a price per share of $0.003737.  Also on or about March 31, 2015, Chen purchased 3,897,621 shares of EPCC for $14,564.40, purportedly from certain South African individuals for a price per share of $0.003737.  (Compl. ¶ 17).

There were no registration statements filed or in effect with respect to the purported sales of EPCC securities from the South African individuals to Lin or Chen.  In particular, the

---

115 (S.D.N.Y.2010)); *Prof'l Investig'g & Consult'g Agency Inc. v. Suzuki*, No. 11 Civ. 1025 (EAPD), 2014 WL 48260, at *3 (E.D. Oh. Jan. 7, 2014) (permitting email service on defendants residing in Hong Kong where such service was "reasonably calculated to apprize Defendants of the action pending against them" and "the circumstances of [the] case warrant alternative service.").

purported sale of shares from the South African individuals to Lin and Chen were not registered pursuant to the EPCC July 2013 registration statement or any other valid registration statement that applied to those specific sales of stock.  (Compl. ¶ 18).

On May 12, 2015, EPCC changed its name to Immage Biotherapeutics Corp. and its ticker symbol to IMMG.  On May 21, 2015, EPCC filed an Article of Merger with the Nevada Secretary of State, "whereby it entered into a merger with its wholly-owned subsidiary [IMMG]."  IMMG was described as "a biotechnology company developing cancer immunotherapy through the rapid and efficient development of cutting edge immunotherapy candidates using bioinformatics and outsourced laboratory resources."  (Compl. ¶ 19).

**Lin's Unregistered Sales of IMMG Securities**

After depositing 4,526,067 IMMG shares with Broker A in August 2015, Lin made low-volume trades in 2015 and 2016.  Lin traded on four days in 2015 and seven days in 2016, selling less than 20,000 shares total and at most 4,440 shares at a time.  Prices during this time ranged from $0.17 to $0.42.  (Compl. ¶ 20).

Beginning in late January 2017, Lin began selling more shares.  From January 31, 2017 to March 21, 2017, Lin sold IMMG shares on ten days, with an average 18,774 shares per day, at daily average prices ranging from $0.2543 to $0.7755 per share.  (Compl. ¶ 21).

From March 28, 2017, when promotional emails (referenced below) began touting IMMG, through April 3, 2017, Lin substantially increased the volume of his sales of IMMG.  He sold a total of 1,279,734 shares in five days, at daily price averages ranging from $0.65 to $1.47 per share.  On March 28, 2017, Lin sold 664,000 shares for net proceeds of $416,080.  On April 3, he sold 277,000 shares at an average price of $1.4745, but at 1:35 p.m. he placed several limit orders to sell 120,000 shares more at prices from $1.63 to $1.72.  About an hour later, he

increased these orders to 20,000 share increments, raising the total shares he would have sold to 200,000 shares (had the price kept rising).  (Compl. ¶ 22).

Before the market opened on April 4, Lin sent his broker sell orders for 73,000 shares to sell at prices from $1.26 to $1.36; these sales could not occur because the trading was suspended by the Commission.  (Compl. ¶ 23).

In total, Lin sold 1,486,734 shares for $1,226,205.48 (net of fees), with a cost basis of $5,555.92.  Lin's profit on these sales was $1,220,649.56.  (Compl. ¶ 24).

**Chen's Unregistered Sales of IMMG Securities**

After depositing 3,897,621 IMMG shares with Broker B on September 15, 2015, Chen traded on two days in 2015, November 12 and 18, when she sold a total of 5,000 shares for $0.25 per share.  (Compl. ¶ 27).

Chen did not sell any IMMG shares again until January 30, 2017.  From January 30, 2017 to March 1, 2017, Chen sold 218,000 shares over 12 days (at an average of 18,167 shares per day) at an average price of approximately $0.47 per share.  On February 8, 2017, Chen sold IMMG shares to a broker-dealer located in New York, New York.  (Compl. ¶ 28).

From March 28, when promotional emails began touting IMMG, to March 31, 2017, Chen also substantially increased the volume of her sales of IMMG.  She sold a total of 664,300 IMMG shares at daily average prices ranging from $0.61 to $1.1286.  On April 3, 2017, Chen placed a day order to sell 100,000 shares of IMMG, but the order was not executed and trading was suspended the next day.  After the trading suspension was automatically lifted ten business days later, Chen sought to sell shares on the grey market through Broker B, but Broker B refused to do so.  (Compl. ¶ 29).

In total, Chen sold 887,300 shares for $586,044.63 (net of fees), with a cost basis of $3,315.84, for a profit of $582,728.79.  (Compl. ¶ 30).

No registration statements were filed or in effect with respect to any of these offers or sales by Lin or Chen to the public.  In particular, Defendants' offers and sales of IMMG stock were not registered pursuant to the EPCC July 2013 Form S-1 registration statement or any other valid registration statement that applied to these specific sales of stock.  (Compl. ¶¶ 25; 31).

The securities sold by Lin and Chen were sold through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.  (Compl. ¶¶ 26; 32).

**Transfers of Illegal Proceeds From Sales Out of the U.S.**

Lin transferred $65,000 on February 9, 2017, and $458,000 on April 3, 2017 – both illegal proceeds from his sales of IMMG stock – and Chen transferred approximately $97,000 on March 6, 2017 – illegal proceeds from her sales of IMMG stock – to accounts at the same bank in Hong Kong.  (Compl. ¶ 33).

Both Lin and Chen attempted to wire to Hong Kong hundreds of thousands of dollars more.  The day after the trading suspension, on April 5, 2017, Lin requested that Broker A wire out of the country $311,000 of cash that had cleared in his account that day.  The next day, April 6, when approximately $400,000 more became available, Lin asked his broker if he should change the wire to reflect all the cash available.  Lin currently has $703,218 in proceeds from the sales of his IMMG shares and 3,039,333 remaining IMMG shares deposited with Broker A. (Compl. ¶ 34).

On March 31, 2017, Chen requested to wire $325,000 from her account to the Hong Kong bank, but Broker B was unable to process the request due to problems at another entity

processing international wire transfers.  Chen has $488,502.46 in proceeds from the sales of her IMMG shares and 3,010,321 remaining IMMG shares deposited with Broker B.  (Compl. ¶ 35).

**Defendants' Illegal Sales Coincided with a Pump-and-Dump Scheme**

On September 14, 2015, IMMG securities appear to have first traded through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.  Over the following year, IMMG traded on only 20 days, from prices ranging from $0.15 to $0.42, and average volume on days traded of only 2,617 shares.  (Compl. ¶ 36).

IMMG issued press releases on September 13, 2016, November 28, 2016, January 6, 2017 and February 16, 2017.  No IMMG shares traded on any of these days except January 6, 2017, when 300 shares traded.  (Compl. ¶ 37).

On March 25, 2017, a penny stock promotional website, Stock Promotion Website A, referred email subscribers to an upcoming stock tip.  On March 27, 2017 at 11:30 AM, Stock Promotion Website A sent another email stating, in part, "IMPORTANT ALERT: MY STOCK TIP OF THE YEAR IS COMING UP TOMORROW.  READ NOW!"  This email further stated, "I'm about to send you my special report tomorrow morning at some time between 9 AM and 10 AM EST."  (Compl. ¶ 38).

On March 27, 2017, IMMG issued a press release stating, in part, that its immunotherapy had "successfully passed early toxicology and efficacy studies" in mice and that the results would help the company "move forward with [their] conversations with the FDA."  On this day, 64,600 IMMG shares traded.  (Compl. ¶ 39).

On March 28, 2017 at 11:18 AM, Stock Promotion Website A sent an email stating, in part, "This biotech [IMMG] may be on the cusp of getting FDA approval for its cancer

therapies."  This reference to "cusp of getting FDA approval" was, at a minimum, materially misleading.  IMMG had in its March 27 press release announced only that it had had some success with mice and hoped to move forward in "conversations" with the FDA, and its January 6, 2017 press release made clear that no applications with the FDA were even pending and that IMMG had only "plans to file for the FDA's IND program for approval into Phase 1 human trials in mid-2018."  Stock Promotion Website A sent additional emails to their subscriber list similarly touting IMMG that same day, and on March 29, 30, and 31, and on April 3, for a total of at least ten promotional emails.  (Compl. ¶ 40).

On March 28, 2017, Stock Promotion Website B sent an email stating, in part, "IMMG seems to be on the verge on [sic] curing cancer according to its latest press release."  This reference to IMMG being on the "verge on [sic] curing cancer" was, at a minimum, materially misleading given the public information contained in IMMG's press releases described above.  Stock Promotion Website B sent additional emails similarly touting IMMG on, at least, March 29 and April 4, 2017.  (Compl. ¶ 41).

On March 28, 2017, Stock Promotion Website C sent an email stating, in part, "This biotech may be on the cusp of getting FDA approval for its cancer therapies."  This language, identical to the language used by Stock Promotion Website A (suggesting that the promotional campaigns might be coordinated by the same individuals), was, at a minimum, materially misleading.  Stock Promotion Website C sent at least one additional email touting IMMG that same day and on April 3, 2017.  (Compl. ¶ 42).

In total, between March 28 and April 4, 2017, when the Commission suspended trading in IMMG stock, at least three promotional sites touted IMMG to their subscriber lists with at least 16 promotional emails.  (Compl. ¶¶ 40-42; 45).  Between March 28 and April 3, 2017,

IMMG's average daily volume was 1,771,165, with a low of $0.40 and a high of $1.62.  (Compl. ¶ 44).

## ARGUMENT

### I.      Default Judgment Standard

In civil cases, where, as here, "a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party." *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984).  In determining whether to enter a default judgment, the Court should accept as true all of the factual allegations of the complaint, except those relating to damages. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *SEC v. Syndicated Food Servs. Int'l, Inc.,* No. 04 Civ. 1303 (NGG)(ALC), 2010 WL 4668777, at * 1 (E.D.N.Y. Nov. 9, 2010).

The Commission may prove the appropriateness of injunctive relief and penny stock bars through the Complaint's allegations, affidavits, and other documentary submissions. *SEC v. Baldassare*, No. 11 Civ. 5970(ARR)(VVP), 2014 WL 2465622, at *7 (E.D.N.Y. May 29, 2014); *Syndicated Food Servs.*, 2010 WL 4668777, at *1-2 (entering permanent injunction and penny stock bar through default judgment based on "[a]ccepting all the allegations in the Complaint as true").  Similarly, the Court may impose disgorgement, prejudgment interest and penalties based on submitted papers.  "[I]t [i]s not necessary for the District Court to hold a hearing, as long as it ensure[s] that there [i]s a basis for the damages specified in a default judgment." *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); *see also Cement & Concrete Workers Dist. Council Welfare Fund  v. Metro Found. Contractors, Inc.* 699 F.3d 230, 234 (2d Cir. 2012) (citing cases giving district court's "much discretion" in determining whether it is "necessary and proper" to hold an inquest on damages); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991) ("Rule 55(b)(2) … does not require the district judge to

conduct a hearing."). The Commission is "entitled to all reasonable inferences from the evidence offered." *Au Bon Pain Corp.*, 653 F.2d at 65.

Because Defendants failed to respond after service of the Complaint, they have defaulted. This Court should therefore accept as true all factual allegations of the Complaint for purposes of establishing liability. *Cotton v. Slone*, 4 F.3d 176, 181 (2d. Cir 1993) (citing *Au Bon Pain Corp.*, 653 F.2d at 65); *see also Flanagan v. N. Star Concrete Const., Inc.*, No. 13 Civ 2300(JS)(AKT), 2014 WL 4954615, at *5 (E.D.N.Y. Oct. 2, 2014) (citations omitted) (adopting magistrate report and recommendation granting default judgment). The Complaint's detailed factual allegations establish that Defendants violated Section 5 of the Securities Act and the Complaint, together with the Declaration of Joseph Darragh dated July 7, 2017 and exhibits attached thereto ("Darragh Decl."), and the McGrath Declaration, support imposition of the requested relief.

## II.     The Complaint Establishes Defendants' Liability With Respect to Section 5 of the Securities Act

Section 5(a) of the Securities Act prohibits the sale of securities in interstate commerce unless pursuant to an effective registration statement. 15 U.S.C. § 77e(a). In addition, Section 5(c) of the Securities Act makes it unlawful to offer to sell securities, through the use or medium of a prospectus or otherwise, unless a registration statement has been filed as to such security. 15 U.S.C. § 77e(c). A *prima facie* Section 5 violation requires proof of three elements: first, that no registration statement was filed or in effect as to the securities; second, that the defendant sold or offered to sell these securities; and third, that there was a use of interstate means in connection with the offer or sale. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Once the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration

was available for the offer or sale of the security.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *see also SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) ("Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption.").  "Scienter is not an element of a section 5 violation, the defendants bear the burden of proving that an exemption applies."  *See id*; *SEC v. Universal Major Indus.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

"Registration is 'transaction-specific,' in that the requirement of registration applies to each offer or sale of a security.  Proper registration of one offering does not necessarily suffice to register subsequent offerings of the security."  *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (holding that registration is "'transaction-specific,' in that the requirement of registration applies to each act of offering or sale; proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security) (citing *Cavanagh*, 155 F.3d at 133).  This is also the Commission's view regarding registration of securities.  *See, e.g.*, *In re Gordon Brent Pierce*, Exchange Act Rel. No. 71664, 2014 WL 896757, at *10 (Mar. 7, 2014).

The registration requirement and its exemptions apply to transactions, not to individuals or securities.  *SEC v. Mattera*, No. 11 Civ. 8323, 2013 WL 6485949, at *10 (S.D.N.Y. Dec. 9, 2013) ("section 4(1) provides an exemption for transactions, not individuals"); *SEC v. Czarnik*, No. 10 Civ. 45, 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010) (same).  Additionally, "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public."  *Cavanagh*, 445 F.3d at 115; *accord SEC v. Verdiramo*, 890 F. Supp. 2d 257, 266 (S.D.N.Y.

12

2011) (same); *SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *19 (S.D.N.Y. Aug. 25, 2011) (same).

Defendants violated Sections 5(a) and 5(c) of the Securities Act.  Defendants sold and offered to sell securities (Lin: Compl. ¶¶ 21-24; Chen: Compl. ¶¶ 27-30); no registration statements were in effect for the offers or sales of those securities by the Defendants (Lin: Compl. ¶¶ 25; Chen: Compl. ¶ 31);[2] and the securities Defendants sold were offered and sold to the public market through the facilities of the U.S. over-the-counter inter-dealer market, which consist of numerous broker-dealer firms that execute transactions through interstate telecommunications networks.  (Lin: Compl. ¶ 26; Chen: Compl. ¶ 32).  Thus, Defendants violated Sections 5(a) and 5(c) of the Securities Act.

### III.    The Court Should Order the Requested Relief

#### A.    Defendants Should Be Permanently Enjoined From Violating Section 5

Section 20(b) of the Securities Act authorizes the Commission to seek permanent injunctive relief upon showing "a substantial likelihood of future violations of illegal securities conduct."  *See Cavanagh,* 155 F.3d at 135.  To determine whether the SEC has made this showing, a court considers the following factors:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional

---

[2] While the Court need not consider the following facts given Defendants' refusal to appear and advance any argument why their sales were exempt from registration, there was also no registration statement in effect with respect to the securities the purported South African investors sold to Lin and Chen (Compl. ¶ 18), and there is overwhelming evidence that the initial purported S-1 sale of securities to the South Africans was a sham (*See generally,* Darragh April 26, 2017 Declaration (Docket # 7) at ¶¶ 8-32 and exhibits attached thereto, and Commission's April 26, 2017 Memorandum of Law in Support of *Ex Parte* Emergency Application (Docket # 5) at pp. 20-28).

occupation, the defendant might be in a position where future violations could be anticipated.

*Id.* (quoting *SEC v. Commonwealth Chem. Secs., Inc.,* 574 F.2d 90, 100 (2d Cir. 1978)).  A permanent injunction is "particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence." *SEC v. Tavella,* 77 F. Supp. 3d 353, 359 (S.D.N.Y. 2015) (granting permanent injunction for sale of unregistered securities) (quoting *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1477 (2d Cir.1996)).

The Court may issue permanent injunctions against future violations of the securities laws as part of a default judgment upon a finding that a factual basis for such relief exists.  *See, e.g., SEC v. Anticevic*, No. 05 Civ. 6991, 2010 WL 3239421, at *3 (S.D.N.Y. Aug. 16, 2010).

Here, the factors strongly argue in favor of a permanent injunction.  First, the Commission has met its burden of pleading that Defendants repeatedly violated the securities laws.  *See* Argument II, above.  Second, although the Commission need not prove scienter in order to establish a Section 5 violation, Defendants' conduct demonstrates strong evidence of scienter.  In March 2015, Defendants bought their IMMG shares in close coordination with eight other Chinese investors and Hong Kong Corp., who together purchased a 100 percent controlling interest in a shell company, EPCC, that was allegedly formed to market and sell charcoal products.  (Darragh Decl. Ex. D).  Less than two months later, EPCC filed an Article of Merger with the Nevada Secretary of State, "whereby it entered into a merger with its wholly-owned subsidiary [IMMG]."  IMMG was described as "a biotechnology company developing cancer immunotherapy through the rapid and efficient development of cutting edge immunotherapy candidates using bioinformatics and outsourced laboratory resources."  (Compl. ¶ 19).

Defendants, after engaging in only sparse sales of their IMMG securities for almost two years, timed the majority of their illegal securities sales to profit from an obvious pump-and-

14

dump scheme designed to improperly inflate that value of their IMMG stock.  The scheme

involved the distribution of misleading and/or patently false promotional emails by three stock

promotion websites falsely claiming that IMMG "may be on the cusp of getting FDA approval

for its cancer therapies" and that IMMG "seems to be on the verge on (sic) curing cancer…"

(Comp. ¶¶ 36-44).  Although there is no direct evidence that Defendants sent these false emails –

which is not uncommon in such schemes where third parties are typically hired to promote or

"pump" the stock – the vast majority of the Defendants' sales of IMMG stock coincided with the

distribution of these false and misleading promotional emails.  Indeed, Defendants attempted to

dump even more securities during this pumping period.  (Compl. ¶¶ 22-23, 29; Darragh Decl. ¶¶

16-17 and Exs. K, L and M).

        In addition, Defendants, based in China, reaped extraordinary profits from their purchase

of penny stocks in a defunct charcoal company that, within two months, radically transformed

into a biotechnology company.  Lin purchased 4,526,067 shares for $16,912.74 ($0.003737 per

share) and sold just a fraction of those shares (1,486,734) for $1,226,205.48 (net of fees), for a

profit of $1,220,649 on just those shares.  (Compl. ¶ 17; 24; Darragh Decl. ¶¶ 6, 18-21 and Exs.

A and L thereto).  Chen purchased 3,897,621 shares for $14,564.40 ($.003737 per share) and

sold just a fraction of those shares (887,330) for $586,044.26 (net of fees), for a profit of $

582,728.79.  (Compl. ¶ 17; 30; Darragh Decl. ¶¶ 7; 23-24 and Exs. B and M).  Both Defendants

were attempting to sell even more shares illegally but were prevented from doing so when the

Commission suspended trading in IMMG.  (Compl. ¶¶ 22-23; 29; Darragh Decl. ¶ 21 fn.1 and

Ex. R; ¶ 25).

        Defendants' purchase, in coordination with eight other Chinese nationals and Hong Kong

Corp., of a 100 percent controlling interest in EPCC, a shell company purportedly set up to sell

charcoal, shortly before this company transformed into a biotechnology company, evidences a high degree of coordination and sophistication by Defendants and their joint purchasers of control of the company.  Defendants' timing of the majority of their sales to coincide with and reap enormous profits from an obvious pump-and-dump scheme, combined with  their efforts to quickly transfer their enormous illegal profits overseas is further evidence of their acute awareness of the illegality of their conduct and of their scienter.

Third, Defendants did not make an isolated sale of securities but instead sold millions of shares of unregistered securities on multiple occasions.  Fourth, Defendants have not acknowledged wrongdoing and continue to maintain that their past conduct was blameless.  Lin sent an email stating, in part: "Despite my opposition to the lawsuit because I believe my conduct is fully justified …." (McGrath Decl. Ex  A).  Chen sent an email stating, in part: "While I am certain that I did not contravene any laws of the United States…."  (McGrath Decl. Ex. B).

Finally, there is a reasonable likelihood that Defendants will violate the securities laws in the future.  "Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations."  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).  Defendants' lack of acknowledgment of wrongdoing is further evidence that they will commit future such violations.

For all these reasons, Defendants should be permanently enjoined from violating Section 5.

### B.     Defendants Should Be Ordered to Disgorge, with Prejudgment Interest, Their Ill-Gotten Gains

When the SEC prevails on its Section 5 claims, courts routinely order defendants to disgorge the gains from their illegal trades.  *See, e.g.*, *SEC v. ConnectAJet.com, Inc.*, No. 09 Civ. 1742, 2011 WL 5509896, at *7-8 (N.D. Tex. Nov. 9, 2011) (ordering disgorgement where unregistered offerings

did not comply with Rule 504(b)(1)(iii)).  Disgorgement deters future violations by "forcing a defendant to give up the amount by which he was unjustly enriched."  *See SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (citing *Comm. Chem. Sec., Inc.*, 574 F.2d at 102).  The amount of disgorgement ordered is discretionary, and "need only be a reasonable approximation of profits causally connected to the violation."  *Id.* (citing *First Jersey*, 101 F.3d at 1475).  Any risk of uncertainty should fall on the wrongdoer whose illegal conduct caused the uncertainty.  *See id.*

Based on Defendants' brokerage records and transactional documents, SEC Staff Investigator Joseph Darragh has determined that Lin illegally sold 1,486,734 shares of IMMG for $1,226,205.48 (net of fees), with a cost basis of $5,555.92.  (Darragh Decl. ¶¶ 6; 18-21 and Exs. A and L).  Thus, Lin's profit on these sales was $1,220,649.56 and he should be required to disgorge this amount of ill-gotten gains.

Darragh has determined that Chen illegally sold 887,300 shares of IMMG for $586,044.63 (net of fees), with a cost basis of $3,315.84, for a profit of $582,728.79.  Darragh Decl. ¶¶ 7; 23-24 and Exs. B and M.  Thus, Chen's profit from her illegal sale of these shares was $582,728.79 and she should be required to disgorge this amount of ill-gotten gains.

Further, the Court may, at its discretion, award prejudgment interest.  *First Jersey*, 101 F.3d at 1476.  "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."  *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  Prejudgment interest is generally calculated according to the IRS underpayment rate, which courts typically use in connection with disgorgement in SEC cases. *See id.* (citing cases).  As of June 30, 2017, measured from the last date Defendants each sold IMMG

shares, prejudgment interest amounts to $3,449.54 for Lin and $942.26 for Chen.  Darragh Decl. ¶

29 and Ex. X- PJI Reports).[3]

C.  The Court Should Impose Civil Monetary Penalties

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), authorizes district courts to assess

civil penalties against persons who violate the Act.  The statute states that the amount of the

penalty shall be determined by the Court "in light of the facts and circumstances."  For each

violation, there are three increasing tiers of penalties, or a penalty of up to the gross amount of

pecuniary gain, whichever is greater.  The first tier requires a showing of a Securities Act

violation.  The second tier additionally requires that the violation "involved fraud, deceit,

manipulation, or deliberate or reckless disregard of a regulatory requirement."  The third tier

adds the requirement that the violation "directly or indirectly resulted in substantial losses or

created a significant risk of substantial losses to other persons."  15 U.S.C. § 77t(d).  All three

tiers set forth a maximum penalty based on the greater of a specified amount per violation

(differing for individuals and entities) or the gross amount of pecuniary gain to such defendant as

a result of the violation.

For violations occurring after November 3, 2015, as is relevant here,[4] the statutory

maximum penalty per violation for individuals is as follows: first tier $9,054; second tier

$90,535; third tier $181,071.  *See* 17 C.F.R. § 201, subpart E, Table VI;

https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.  As noted above, Lin's

---

[3] The proposed Final Judgment also directs the brokerage firms holding the Defendants' frozen
ill-gotten gains to turn over those cash assets to the Commission in partial satisfaction of the
requested disgorgement amount.

[4] Lin made only one sale, of just 2,000 shares for a net profit of $294.98, prior to November 3,
2015 (Darragh Decl. Ex. L).  The rest of Lin's sales (*id.)*, and all of Chen sales (Darragh Decl.
Ex. M) occurred after November 3, 2015.

pecuniary gain from his violations was $1,220,649.56 and Chen's pecuniary gain from her violations was $582,728.79.

Courts have used different methodologies to calculate a penalty based on each violation of the securities laws. *See, e.g., SEC v. GTF Enterprises, Inc.* 10 Civ. 4258, 2015 WL 728159 at *5 (S.D.N.Y. Feb. 19, 2015)(citing cases and methodologies).  The Court could multiply the statutory maximum amount by each illegal sale of stock (1,486,734 shares illegally sold by Lin; 887,300 shares illegally sold by Chen); or it could impose a penalty for each defrauded purchaser (not easily determinable here) or it could impose a penalty based on each statutory violation (in this case one statutory violation for each Defendant).  Alternatively, under either the first, second or third tier, the Court could impose a penalty up to the amount of each Defendant's pecuniary gain: $1,220,649.56 for Lin and $582,728.79 for Chen.

The Commission requests that the Court impose the maximum appropriate penalty. We note that the Second Circuit and district courts in this Circuit have imposed second and third tier penalties for Section 5 violations even though scienter is not an element of a violation of that statute.  *See, e.g., SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (affirming third-tier civil penalties); *SEC v. Verdiramo,* No. 10 Civ. 1888 (RMB)(AJP), 2013 WL 399230 at * 1, (S.D.N.Y. Feb. 1, 2013) (imposing second tier penalty on defendant whose sale of 158,333 unregistered shares on fifteen occasions over several months constituted egregious conduct, evidenced reckless disregard and created the risk of substantial losses to others); *In re Reserve Fund Sec. & Derivative Lig'n,* Nos. 09 MD 2011 (PGG); 09 Civ. 4346 (PGG); 2013 WL 5432334 at * 18-20 (S.D.N.Y. Sept. 30, 2013) (imposing second tier penalty for Section 5 violation); *SEC v. E. Delta Res. Corp.,* No. 10 Civ. 310 (SJF), 2012 WL 3903478, at * 9 (E.D.N.Y. Aug. 31, 2012) (same).

Civil penalties serve a dual purpose: to punish the individual violator for his past violations and deter future violations of the securities laws. *Razmilovic*, 738 F.3d at 38 (affirming third-tier civil penalties). In determining whether civil penalties are appropriate, courts consider the egregiousness of defendant's conduct; the degree of scienter; whether the conduct was isolated or recurrent; whether it caused substantial losses or risk of losses to others; and the defendant's financial condition. *SEC v. Opulentica,* 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

As discussed in the context of a permanent injunction above, each of these factors would support imposing third-tier civil penalties against Defendants, given the egregiousness of Defendants' scheme to illegally flood the markets with millions of shares unregistered securities timed to coincide with a fraudulent pump-and dump scheme to maximize profits and defraud the purchasers of the millions of shares of illegally sold securities. Defendants' efforts to quickly transfer their ill-gotten gains out of the country is striking evidence of their scienter and the Defendants' extraordinary profits were obtained at the expense of investors who lost substantial sums of money purchasing these fraudulently inflated securities.[5]

Accordingly, the Commission respectfully requests that the Court impose the maximum appropriate penalty against Defendants.

---

[5] As noted above, regardless of which of the three tiers the Court deems applicable, a penalty at least equal to each Defendant's gross gain ($1,220,649.56 for Lin; $582,728.79 for Chen) is within the statutory maximum.

D.      <u>The Court Should Impose a Permanent Penny Stock Bar on Defendants</u>

IMMG was a penny stock.  (Compl. ¶ 1; *see also ¶ 38).*[6]  Under Section 20(g) of the

Securities Act, a penny stock bar is appropriate "against any person participating in, or, at the

time of the alleged misconduct, who was participating in, an offering of penny stock."  The

standard for imposing a penny stock bar essentially mirrors that for imposing an officer-or-

director bar.  *Universal Exp.,* 475 F. Supp. at 429.  Those factors include: (1) the egregiousness

of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the

defendants' role or position when he engaged in the fraud; (4) the defendant's degree of scienter;

(5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will

reoccur.  As discussed above, the instant violations were egregious in that the Defendants caused

millions of shares of unregistered securities to be dumped on the market at the very time when

the price of the securities were being fraudulently inflated by false and misleading promotional

emails designed to dupe investors; Defendants made repeated illegal sales involving millions of

unregistered securities; Defendants, as the owners of the shares, played a central role in the

scheme; they had a substantial economic stake in the violation as owners of the shares and

reaped enormous profits; Defendants' evidenced scienter by immediately seeking to transfer

their ill-gotten profits overseas; and there is a high likelihood Defendants will offend again given

their assertion they have done nothing wrong and their location overseas which provides them a

layer of protection from enforcement of civil and criminal remedies against them.

---

[6] Penny stocks are defined in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder, to consist of stocks that, *inter alia,* are equity securities that traded below five dollars per share during the relevant period and that met certain other criteria set forth in Rule 3a51-1.

## **CONCLUSION**

For all of the foregoing reasons, the Commission respectfully requests that the Court

enter a default judgment against each Defendant and impose the requested relief.

Dated: July 11, 2017

                              _____/s/ Kevin P. McGrath_____
                              Kevin P. McGrath
                              Jennifer K. Vakiener
                              Hane L. Kim
                              Steven G. Rawlings
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              200 Vesey Street
                              New York, N.Y. 10281
                              (212) 336-0533 (McGrath)
                              mcgrathk@sec.gov